No. 01-423

IN THE SUPREME COURT OF THE STATE OF MONTANA

2003 MT 114

STATE OF MONTANA,

      Plaintiff and Respondent,

   v.

RICHARD ALAN AYERS, JR.,

      Defendant and Appellant.

APPEAL FROM:    District Court of the  Sixth Judicial District,
                  In and for the County of Park, Cause No. DC 99-135
                  The Honorable Wm. Nels Swandal, Judge presiding.

COUNSEL OF RECORD:

      For Appellant:

            Larry Jent, Williams & Jent, Bozeman, Montana; Kevin S. Brown, Paoli &
            Brown, Livingston, Montana

      For Respondent:

            Mike McGrath, Montana Attorney General, Cregg W. Coughlin, Assistant
            Montana Attorney General, Helena, Montana; Tara DePuy, Park County
            Attorney, Livingston, Montana

Submitted on Briefs:  May 23, 2002

Decided:  April 28, 2003

Filed:

_____
Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1     On January 12, 2000, Richard Ayers (Ayers) was charged by information in the Sixth Judicial District Court with seven different charges, including deliberate homicide, aggravated burglary, theft, and felony sexual assault.  On December 18, 2000, following a week-long jury trial, Ayers was found guilty of six counts, and later pled guilty to the seventh count, which had been severed prior to trial.  On February 28, 2001, the District Court sentenced Ayers to life in prison without the possibility of parole on the deliberate homicide count, along with additional time periods for the other six counts.  Ayers appeals several evidentiary rulings by the District Court.  We affirm.

¶2     Ayers presents the following four issues on appeal:

1.  Whether the District Court erred in denying Ayers' motion in limine to exclude testimony using the "likelihood ratio" in presenting DNA results;

2.  Whether the District Court erred in denying Ayers' motion to disclose the identity of a confidential informant;

3.  Whether the District Court erred in denying Ayers' motion to exclude evidence; and

4.  Whether the District Court erred in admitting evidence of Ayers' 1990 Wyoming conviction for first degree sexual assault.

### FACTUAL AND PROCEDURAL BACKGROUND

¶3     On Tuesday, December 7, 1999, the body of Mary Phyllis Martz (Phyllis) was discovered in her Livingston Village Apartment by the apartment-complex manager. Phyllis had been beaten about the head and neck, sexually assaulted, stabbed once in the back and

2

once in the chest, and her throat had been sliced. At the time of her death, Phyllis was 54 years old, but appeared older than her chronological years. Phyllis smoked unfiltered cigarettes and was described as a "closet drinker," purchasing a bottle of vodka at a local liquor store on nearly a daily basis. According to friends and neighbors, Phyllis was a sociable, friendly person who frequently visited neighbors in the Livingston Village Apartment complex.

¶4     Phyllis lived alone in her apartment ever since her husband, Dallas Martz (Dallas), had been incarcerated on September 21, 1999. Apparently, Phyllis would leave her apartment unlocked during the day and would lock it before going to bed. The Martzes owned two cars--a 1978 Chevy Nova and a 1988 red/maroon Ford Taurus, which had mechanical problems that caused it to overheat. According to Dallas, the Taurus was Phyllis's car and she would not allow anyone else to drive it.

¶5     On Thursday, December 2, 1999, Phyllis drove one of her neighbors, Marilyn Fournier (Fournier), to the store in her Taurus. Fournier is Ayers' mother and lived in the same apartment complex as Phyllis. Later that same day, Fournier asked Ayers, who was visiting her at her apartment, to go to Phyllis's apartment to retrieve her hair dryer, which according to Fournier, he did.

¶6     On Monday evening, December 6, a tenant in the apartment complex reported that the door to Phyllis's apartment was ajar and Phyllis's dog was inside barking. Apparently, the door to Phyllis's apartment was difficult to close due to the poor condition of weather stripping. The complex manager went to Phyllis's apartment, found the door ajar, retrieved

the dog and then securely closed the door. The next day, Tuesday, December 7, Phyllis's door was again ajar. When the apartment manager went to investigate, she discovered Phyllis's body and called 911.

¶7     Phyllis was found on her back on the living room floor. Her body was covered by either a table cloth or curtain-type material, and her face had been covered with a bath mat. Her shirt was open and her bra had been pushed up, with her left breast partially exposed and her right breast fully exposed. Phyllis had been stabbed in the chest, apparently after her bra and shirt had been removed, as there were no cuts on either piece of clothing. She was also stabbed once in the back, through her shirt. There was an incise wound across Phyllis's throat, which was described as "fairly superficial," and was most likely inflicted after the chest wound. Based on the condition of Phyllis's body and considering the warm temperature in her apartment, the State Medical Examiner, Dr. Gary Dale (Dr. Dale) testified that at a minimum, Phyllis probably died two or three days before her body was discovered.

¶8     A small glass vase was positioned across Phyllis's neck just below the incise wound on her throat. Phyllis's pants, underpants, and socks had been removed, apparently in one motion, and her glasses were on the floor with blood smears on the inside of the lenses. A folded paper towel was positioned directly underneath Phyllis's vaginal area; however, one of the investigators, Agent Larry Johnson (Johnson), testified that he did not find any evidence of sexual intercourse at the crime scene.

¶9     Two newspapers were discovered on the floor to the left of Phyllis's body--one dated Friday, December 3, 1999, and the other dated Saturday, December 4, 1999. A torn piece

of the Saturday newspaper was stuck to Phyllis's left hand with dried blood. Subsequent analysis of the papers revealed two latent palm prints on the Saturday newspaper--both made by Ayers' left hand.

¶10    While the crime scene was being processed, an all-points bulletin was issued on Phyllis's Taurus, which was missing from her parking space. At around 9:30 p.m., on Tuesday, December 7, the car was located in an alley, and was later seized pursuant to a search warrant. A search of the vehicle produced no physical evidence, and the car appeared to have been wiped clean. Later on the 7th, police received a phone call from a Livingston resident who suspected Ayers might be involved with Phyllis's death.

¶11    According to Ayers' friend, Jake Fox (Fox) and Fox's girlfriend, Teri Kniffin (Kniffin), Ayers drank with them the evening of Friday, December 3, and stayed all night. The next day, Saturday, December 4, Ayers was again at Fox's trailer, when he called for a taxi. A taxi driver dropped Ayers off at the Livingston Village Apartment complex at around 5:00 p.m. According to Fournier, Ayers visited with her for about ninety minutes and then left, supposedly to walk to a nearby gas station.

¶12    Ayers was seen later on Saturday evening at a house party given by Aaron Paul (Paul). According to Paul, he and Ayers got into a "reddish" four-door car that Ayers explained he borrowed from a friend who had "passed out" from drinking too much. While Paul was driving the car, it began to overheat. Ayers indicated he had access to another car, and directed Paul to drive to the Livingston Village Apartments, and pull in next to the Martzes' Nova. Ayers went indoors and returned a few minutes later, explaining to Paul he

5

could not find the Nova keys. According to Paul, he and Ayers spent a couple of hours driving around that night, and he described Ayers as acting jumpy and paranoid, but considered that normal for Ayers. That night, Paul observed two throwing knives in the car, which were later determined to fit the description of two knives belonging to Dallas Martz.

¶13 On December 7, the day Phyllis's body was discovered, Ayers picked Fox up at Kniffin's apartment at around noon, and the two drove to Bozeman. Ayers was driving the red Taurus, which he referred to as "the boss's car," and while in Bozeman, Ayers told Fox that he hoped the car had not been reported stolen. After the two returned to Livingston, Fox and Ayers wiped the car down with rubbing alcohol (Fox initially denied his involvement with the car but later admitted he helped wipe it down; Fox pled guilty to felony evidence tampering). Phyllis's Taurus was discovered later that evening in an alley near Kniffin's apartment.

¶14 Ayers was apprehended on Wednesday, December 8. Police took the two knives into evidence after Ayers' girlfriend turned them over. These knives were later identified as those missing from the Martz residence.

¶15 Ayers was charged by information on January 12, 2000, with the following offenses: Count I, deliberate homicide, a felony; Count II, aggravated burglary, a felony; Count III, theft, a felony; Count IV, tampering with evidence, a felony; Count V, failure to register as a sex offender, a felony; Count VI, sexual assault, a felony; and Count VII, obstructing a peace officer, a misdemeanor. Ayers filed a motion to sever Count V, failure to register as a sex offender, which the District Court granted.

6

¶16 At the omnibus hearing on April 3, 2000, the State declared that while a confidential informant was involved, the confidential informant (CI) would not be called to testify. The State relied on the privilege of nondisclosure as to the CI's identity. Also during the omnibus hearing, the State disclosed its intent to introduce evidence of other crimes pursuant to Rule 404, M.R.Evid., and filed its notice of intent on April 10, 2000.

¶17 The State sought to present evidence of Ayers' 1990 guilty plea to the offense of first degree sexual assault, a felony, in Wyoming. The information from the Wyoming case indicated that Ayers sexually assaulted an elderly lady and then took her vehicle. The State argued that the nature of the Wyoming crime was similar to what it alleged occurred in this case. On August 28, 2000, the District Court granted the State's motion to introduce evidence of Ayers' prior conviction to prove both motive and identity (which the court noted became an issue upon Ayers' notice of intent to use alibi as a defense).

¶18 On September 1, 2000, Ayers filed a combined motion to compel and motion for additional discovery, which included a request for the identity of confidential informants who provided information to law enforcement. Ayers argued that the State was required to disclose the identity and investigative materials regarding the CI. Ayers believed the CI had claimed that Fox had bragged about involvement with Phyllis on the night she was killed. On October 23, 2000, following an *in camera* inspection of the reports, files and statements requested by Ayers, including the files containing information from the CI, the District Court ordered that it would not release the CI's files.

¶19 Ayers also filed a memorandum in support of his motion to exclude presentation of

DNA evidence using the "likelihood ratio" (LR)--which is the ratio of conditional probabilities (as explained in more detail in Issue 1). Analysis of swabs taken from Phyllis's breasts had indicated the presence of Ayers' DNA, and the State sought to present evidence using the LR to assist the jury in understanding the DNA evidence. On December 4, 2000, following hearings on the motion, during which the court heard from three different experts, the District Court denied Ayers' motion in limine to exclude testimony regarding the LR. The court entered its Findings of Fact and Conclusions of Law denying the motion on December 18, 2000.

¶20 On November 20, 2000, Ayers filed a notice to withdraw his affirmative defense of alibi. He then filed a motion to reconsider the court's ruling on the admissibility of his Wyoming conviction, arguing that since the court's ruling was based in part on the alibi defense, the court should reconsider. The District Court denied Ayers' motion, explaining that while Ayers had withdrawn his alibi defense it still appeared to the court "that the salient issue in this trial is the identity of the perpetrator," and added that the evidence of Ayers' prior conviction could also still be offered for the purposes of proving motive.

¶21 Just prior to the State's opening statement, Ayers made an oral motion to exclude the following: evidence of palm prints found on the Saturday, December 4 newspaper that matched Ayers' left palm; the newspaper fragment stuck to Phyllis's hand that had torn from the December 4 newspaper; and the knife carrying case from Martz's apartment that matched the two throwing knives missing from Martz's apartment. Ayers argued that he had received the crime lab reports on the evidence just before trial, and asked the court to exclude

8

testimony about those items. The District Court denied Ayers' motion the next day. However, the court noted that Ayers could request a two-week continuance to interview the pertinent witnesses and/or to prepare for this evidence. Ayers did not do so.

¶22 Ayers' trial commenced on December 12, 2000, and ended on December 18, 2000, when the jury returned a verdict of guilty on Counts I, II, III, IV, VI, and VII. On February 5, 2001, Ayers pled guilty to Count V, which had been severed from the other counts prior to trial. The court filed its written judgment and sentence on March 1, 2001. Ayers appeals from the District Court rulings entered prior to and during trial.

## STANDARD OF REVIEW

¶23 The authority to grant or deny a motion in limine "rests in the inherent power of the court to admit or exclude evidence and to take such precautions as are necessary to afford a fair trial for all parties." *State v. Krause*, 2002 MT 63, ¶ 32, 309 Mont. 174, ¶ 32, 44 P.3d 493, ¶ 32 (quoting *Hulse v. State, Dept. of Justice*, 1998 MT 108, ¶ 15, 289 Mont. 1, ¶ 15, 961 P.2d 75, ¶ 15). Therefore, we will not overturn a district court's grant or denial of a motion in limine absent an abuse of discretion. *Krause*, ¶ 32 (citing *Hulse*, ¶ 15).

¶24 This Court reviews a district court's evidentiary rulings for abuse of discretion. *State v. Enright*, 2000 MT 372, ¶ 21, 303 Mont. 457, ¶ 21, 16 P.3d 366, ¶ 21 (citation omitted).

¶25 We have specifically held that "[b]ecause the admission of other crimes is directed to the relevance and admissibility of such evidence," this Court reviews "a trial court's decision on whether to admit evidence of other crimes, wrongs or acts under Rule 404(b), M.R.Evid., for abuse of discretion." *State v. Aakre*, 2002 MT 101, ¶ 8, 309 Mont. 403, ¶ 8,

9

46 P.3d 648, ¶ 8.

¶26    Finally, we note that the test for abuse of discretion is whether the district court acted arbitrarily without conscientious judgment or exceeded the bounds of reason. *State v. Richardson*, 2000 MT 72, ¶ 24, 299 Mont. 102, ¶ 24, 997 P.2d 786, ¶ 24 (citation omitted).

## DISCUSSION

### Issue 1

¶27    **Did the District Court err in denying Ayers' motion in limine to exclude testimony using the "likelihood ratio" in presenting DNA results?**

¶28    During the autopsy, swabs from each of Phyllis's breasts were collected and examined for evidence. Analysis at the State crime lab revealed the presence of Amylase, which is an enzyme found in saliva, on both swabs. However, because the crime lab was relocating its facility at the time, the swabs were sent to a private laboratory, the Laboratory Corporation of America (LabCor) for DNA profiling. Further analysis showed both male and female markers in the sample from the left breast, and Ayers could not be excluded as a contributor of the DNA alleles found in the left breast sample.

¶29    Because the samples were so small, LabCor used the polymerase chain reaction method (PCR) for analyzing the DNA evidence. LabCor's analysis showed that DNA found in the swab from the right breast was consistent with Phyllis and while there was a trace amount of additional DNA, it failed to meet reporting standards. LabCor's DNA profile of the left breast swab indicated a mixture of DNA from more than one individual, and LabCor concluded that neither Phyllis, nor Ayers, could be excluded as contributors of the genetic

10

material from that swab. LabCor did not conduct a statistical analysis on this sample, because at that time it was not its policy to conduct such an analysis on mixed samples. On request of the State, the data was forwarded to Dr. Chris Basten (Dr. Basten), a Research Associate Statistician at North Carolina State University. Using LabCor's DNA testing results, Dr. Basten performed a type of calculation analysis known as a LR ("likelihood ratio") to explain the relevance of the evidence.

¶30    LabCor conducted PCR analysis on the breast swabs. PCR testing is often used when the provided sample is small, since PCR allows the technician to amplify the DNA extracted from the sample by making millions of copies of the areas on the chromosome they wish to analyze. Here, both breast swabs contained what is referred to as a "mixed sample"--that is, it contained alleles from two or more individuals. According to the final report for the left breast sample, LabCor ran seven different genetic markers, and for all seven, it found alleles that were consistent with being contributed by either Phyllis or Ayers. LabCor concluded that there was nothing in those alleles that indicated there was another possible contributor to that mixed sample. To analyze the relevance of the evidence, Dr. Basten explained that since the DNA evidence came from a mixed sample, he used the LR to allow comparison of differing explanations for how it came about.

¶31    The LR, which is a ratio of conditional probabilities, is a measure of the strength of a piece of evidence in distinguishing between hypotheses. *See State v. Garcia* (Ariz.Ct. App. 1999), 3 P.3d 999, 1000, fn 1 (citing Geoffrey K. Chambers et al., *Forensic DNA Profiling: The Importance of Giving Accurate Answers to the Right Questions*, 8 Crim. L.F.

445, 454-55 (1997)).  The LR is used to evaluate how strong a proposition or hypothesis is by comparing it to another explanation.  Here, the State's theory (or hypothesis) was that the two contributors to the left breast DNA evidence were Phyllis and Ayers.  To evaluate how strong that proposition was, it had to be compared to another explanation, such as the hypothesis that Phyllis and an unknown individual were the contributors.  Here, based on Ayers' general denial of guilt, Dr. Basten calculated the probability of the evidence under each one of those theories (*i.e.*, he ran an algorithm of the different possible combinations of alleles at all the different genetic markers, or "loci") and then compared them by taking a ratio of those two probabilities.

¶32    Dr. Basten explained the LR calculation in this way:

> [I]n order to asses how strong a proposition is, or any explanation is, you have to compare it to another explanation.  So, usually you have one explanation that's offered by the prosecution.  We usually call that the prosecution explanation.
> Then to determine how strong that explanation is, how strong that result is, you devise another explanation.  We can refer to that as the defense explanation, and there may be a number of those.
> Then what you do is you calculate the probability of the evidence under each one of those scenarios, and you compare them by taking a ratio of those two probabilities. . . .
> [When phrasing the results of the ratio we are] always talking about the likelihood of the evidence under two different scenarios.  We're never talking about the likelihood that he's the contributor or not, but the evidence if he's the contributor versus the evidence that he's not the contributor.

¶33    In calculating the LR, Dr. Basten relied on formulas set forth by a group of genetic statisticians in an article published in the Journal of Forensic Sciences in 1997.  *See* Bruce S. Weir, et al., *Interpreting DNA Mixtures*, 42 J. Forensic Sci. 213 (1997).  According to Dr.

Basten, the statistical formulas have been subjected to peer review and publication. Based on his calculations, Dr. Basten concluded that the evidence (*i.e*., DNA sample from the left breast swab), "was 330,000 times more likely if it came from the defendant and the victim than if it came from the victim and some unknown [person]. " Or stated another way, "the evidence is 330,000 times more likely under the prosecution hypothesis than one specific alternate hypothesis."

¶34    On appeal, Ayers argues that Dr. Basten's expert testimony should have been excluded on the following grounds: 1) the LR is a novel statistical evidence technique and should therefore be subject to analysis under *Daubert v. Merrell Dow Pharmaceuticals, Inc*. (1993), 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d. 469; 2) the computer program used by Dr. Basten was not reliable or generally accepted, and could not be verified; 3) Dr. Basten was unable to do the calculations in the courtroom; and 4) the LR formula used by Dr. Basten was based on assumptions which did not consider real population characteristics.

¶35    The admissibility of expert testimony is governed by Rule 702, M.R.Evid., which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

A district court is "vested with *great* latitude in ruling on the admissibility of expert testimony." *State v. Southern*, 1999 MT 94, ¶ 48, 294 Mont. 225, ¶ 48, 980 P.2d 3, ¶ 48 (quoting *Durbin v. Ross* (1996), 276 Mont. 463, 477, 916 P.2d 758, 767) (emphasis in

original).

¶36     As we have repeatedly stated, "the test for admissibility of expert testimony is whether the matter is sufficiently beyond common experience that the opinion of the expert will assist the trier of fact to understand the evidence or to determine a fact in issue." *Southern*, ¶ 49 (citation omitted).  Therefore a trial court must first determine "whether the subject matter of the testimony is one that requires expert testimony," and "whether the particular witness is qualified as an expert to give an opinion in the particular area on which he or she proposes to testify."  *Southern*, ¶ 49 (citation omitted).  Finally, Rule 702, M.R.Evid., "implicitly requires a foundation showing that the expert has special training or education and adequate knowledge on which to base an opinion." *Southern*, ¶ 49.

¶37     Although Ayers asserts that the LR is unreliable under *Daubert*, we conclude that the *Daubert* standard is inapplicable here since that standard applies only to the admissibility of novel scientific evidence.  *Hulse*, ¶¶ 56-57 (affirming our holding in *State v. Cline* (1996), 275 Mont. 46, 55, 909 P.2d 1171, 1177, that "all scientific expert testimony is not subject to the *Daubert* standard and the *Daubert* test should only be used to determine the admissibility of novel scientific evidence").

¶38     In *Hulse*, we concluded that the Horizontal Gaze Nystagmus (HGN) test was not novel scientific evidence, noting that for several decades, law enforcement officials had used the HGN test, and that as early as 1986, the admissibility of the HGN test had been considered in other jurisdictions.  We cited with approval the Minnesota Supreme Court comment that "the HGN test 'can hardly be characterized as an emerging scientific technique'

14

because nystagmus has long been known and the tests have been in common medical use for many years." *Hulse*, ¶ 68 (citing *State v. Klawitter* (Minn. 1994), 518 N.W.2d 577, 584).


¶39    Likewise, we concluded in *Southern* that microscopic hair comparison evidence was not novel scientific evidence--noting that since 1978 we had considered several cases wherein witnesses had testified on such evidence and that comparing hair samples with a microscope had been done for decades--and therefore *Daubert* standards were not applicable to determine its admissibility. *Southern*, ¶ 59.

¶40    While it is clear from our prior decisions that there is no set standard for determining whether a scientific technique is "novel," we have consistently given credence not only to previous treatment of the technique by other cases and jurisdictions, but also to how long the technique or theory has been used in the scientific community. Applying those standards here, we conclude that the LR is not a novel scientific technique.

¶41    First, according to Dr. Basten, the widely used paternity statistic known as "paternity index" or "probabilities of paternity" is basically the same thing as a "likelihood ratio." A "paternity index" calculation considers the genetic evidence from a mother, child, and putative father and compares the hypothesis that the putative father is the father versus the hypothesis that another man is the father. According to Dr. Basten, while the specific equations might be slightly different between a paternity index (dealing with mother, child, and putative father) and the LR in a criminal investigation (suspect, victim and evidence stain), both involve the same theory: "you're calculating the probability of what you see,

15

evidence or data, given different ideas as to how it came about."

¶42    In *State v. Weeks*, the State presented statistical analysis based on a paternity test to prove the defendant had sexual intercourse without consent with his thirteen-year old stepdaughter who became impregnated. *Weeks* (1995), 270 Mont. 63, 891 P.2d 477 (The statistical analysis determined the defendant was 154,000 times more likely to be the father of his stepdaughter's baby). Dr. Basten, having reviewed *Weeks*, explained that the paternity index used in that case was basically a LR.

¶43    During the pre-trial hearing, Dr. Basten told the court that in at least six previous cases, his testimony was based on the LR, including a Montana case tried in 1998, State v. Swan, Fourth Judicial District Court, Missoula County, Cause No. 12594 (neither the admission of DNA evidence, nor the LR were appealed in that case). Moreover, Dr. Basten also testified in *Garcia*, 3 P.3d 999, where the Arizona Supreme Court concluded that interpretation of mixed DNA samples using statistical formulas for calculating LR's were generally accepted by the relevant scientific community and were therefore admissible under *Frye v. United States* (D.C. Cir. 1923), 293 F. 1013.

¶44    Second, we take note of many journal articles written on the topic of presenting DNA results which incorporate discussion of the LR. *See, e.g.*, Jonathan J. Koehler, *On Conveying the Probative Value of DNA Evidence: Frequencies, Likelihood Ratios, and Error Rates*, 67 U. Colo. L. Rev. 859 (1996); William C. Thompson, *DNA Evidence in the O.J. Simpson Trial,* 67 U. Colo. L. Rev. 827, 828 (1996); Jonathan J. Koehler, *Why DNA Likelihood Ratios Should Account for Error (Even When A National Research Council*

16

*Report Says They Should Not)*, 37 Jurimetrics J. 425 (1997).

¶45    Based upon the foregoing authority, we conclude that the LR is not a novel scientific technique that warrants analysis under *Daubert*.  However, we must still determine its admissibility under a conventional Rule 702, M.R.Evid., analysis.  *See State v. Hocevar*, 2000 MT 157, ¶ 58, 300 Mont. 167, ¶ 58, 7 P.3d 329, ¶ 58; *Southern,* ¶¶ 59-60; and *Hulse*, ¶ 69.

¶46    First, we have stated that "expert testimony is required in areas not within the range of ordinary training or intelligence."  *Hocevar*, ¶ 58 (citing *Hulse*, ¶ 48).  Based on our review of the intricacies and mathematical principles underlying calculation of the LR and other statistical analyses related to DNA evidence, we conclude that the LR is a subject matter that requires expert testimony.

¶47    Second, the record clearly indicates that Dr. Basten is qualified to testify as an expert witness on the basis of both his educational background and his experience.  In fact, Ayers does not challenge Dr. Basten's qualifications as an expert on the LR.  Rather, Ayers attacks the veracity and reliability of the specific computer program and methodology that Dr. Basten used.

¶48    We have noted that criticisms of specific applications of procedures or concerns about the accuracy of test results does "not render the scientific theory and methodology invalid or destroy their general acceptance.  These questions go to the weight of the evidence, not the admissibility."  *Weeks*, 270 Mont. at 83, 891 P.2d at 489 (citation omitted).  Moreover, we have consistently stated that "it is better to admit relevant scientific evidence in the same

17

manner as other expert testimony and allow its weight to be attacked by cross-examination and refutation." *Southern*, ¶ 50 (citing *Barmeyer v. Montana Power Co.* (1982), 202 Mont. 185, 193-94, 657 P.2d 594, 598, overruled on other grounds by *Martel v. Montana Power Co.* (1988), 231 Mont. 96, 752 P.2d 140). *See also*, *State v. Moore* (1994), 268 Mont. 20, 42-43, 885 P.2d 457, 471, overruled on other grounds by *State v. Gollehon* (1995), 274 Mont. 116, 906 P.2d 697 (even though the foundation for the State's expert witness was "shaky," the district court did not err in ruling the defendant's objection to the DNA evidence went to the weight, and not the admissibility, of the evidence). Finally, "[n]ot every error in the application of a particular methodology should warrant exclusion. An alleged error in the application of a reliable methodology should provide the basis for exclusion of the opinion only if that error negates the basis for the reliability of the principle itself." *Moore*, 268 Mont. at 42, 885 P.2d 471 (citation omitted).

¶49    While we recognized in *Weeks*, 270 Mont. at 84, 891 P.2d at 489 (citation omitted), that "courts must be mindful that the probative value of statistical probabilities evidence is not outweighed by any unfair prejudicial effect," we conclude that admission of Dr. Basten's conclusions using the LR did not unfairly prejudice Ayers. At both the hearing on his motion in limine and the trial, Ayers had the opportunity to cross-examine Dr. Basten concerning the computer program he used to run the formula, his methodology, and his application of various sampling error standards. While Ayers identified two expert witnesses at the pre-trial hearing, Ayers chose not to present an expert at trial to refute or challenge Dr. Basten's calculations, methodology, or formulas.

18

¶50     We conclude that the issues concerning Dr. Basten's techniques/methods went to the weight of the evidence, not its admissibility. Based on the foregoing, we further conclude the District Court did not abuse its discretion when it allowed Dr. Basten to testify using the LR.

**Issue 2**

¶51     **Did the District Court err in denying Ayers' motion to disclose the identity of a confidential informant?**

¶52     On October 23, 2000, following an *in camera* inspection of the reports, files and statements requested by Ayers, the District Court ordered that it would not release the CI's files (Files Nos. 6 and 7). In its order, the District Court explained that File No. 6 generally consisted of hearsay information that was discussed in other reports already made available to defense counsel, and noted that the CI had no independent information about the homicide. The court determined that the file consisted of other information that would be considered inculpatory, not exculpatory, and noted that preventing Ayers from viewing the file would not adversely affect his ability to prepare a defense. The court concluded that the balancing test weighed heavily on the side of the State for non-disclosure. The District Court also concluded that File No. 7 contained no useful or relevant information and ordered that it not be disclosed.

¶53     Ayers argues that according to the investigative report he did receive, the CI had told law enforcement that Jake Fox had bragged about having sex with Phyllis on the night she was murdered and that the CI had knowledge of important details of the homicide. Ayers

19

contends that his investigator could have followed up on information from the CI and possibly found other witnesses who may have heard Fox make similar statements. Ayers argues the court erred by denying discovery upon the ground that the file contained inculpatory information, and also argues that Fox's statements would have been admissible at trial to effectively cross-examine and impeach Fox.

¶54    In response, the State points out that the investigative report showed that the CI did not have any first-hand knowledge about Fox's statements, nor did he have knowledge of any of the important details of the homicide. In addition, the State argues that consideration of the inculpatory or exculpatory nature of the evidence is a part of the balancing test required when assessing whether to disclose an informant's identity.

¶55    The State may claim the privilege to refuse to disclose the identity of a confidential informant. However, this privilege is not absolute and is subject to the balancing test enunciated in *Roviaro v. United States* (1957), 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639. In *Roviaro*, the United States Supreme Court explained,

> We believe that no fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors.

*Roviaro*, 353 U.S. at 62. This Court has repeatedly applied this test since we first recognized it in *State ex rel. Offerdahl v. Dist. Ct. Of Eighth Jud. Dist.* (1971), 156 Mont. 432, 481 P.2d 338. *See, e.g.*, *State v. Sarbaum* (1995), 270 Mont. 176, 180-81, 890 P.2d 1284, 1287; *State*

*v. Campbell* (1992), 254 Mont. 425, 429-30, 838 P.2d 427, 430; and *State v. Crowder* (1991), 248 Mont. 169, 176, 810 P.2d 299, 303. "In this balancing test the burden is on the *defendant* to show the need for disclosure, and this need must be one which overrides the government's interest. Mere speculation will not suffice." *Campbell*, 254 Mont. at 430, 838 P.2d at 430 (citation omitted) (emphasis in original).

¶56    Based on our review of the record, including the CI's files, and the above-cited authority, including the balancing test from *Roviaro*, we conclude that the District Court did not err in denying Ayers' motion to compel disclosure of the CI's identity.

¶57    First, we note that the investigative report provided to Ayers accurately summarized the interview between law enforcement officers and the CI, and omitted only the CI's identity. The report explains that Fox's statement originated from an alleged conversation between Debbie Bauer (Bauer)--who was named in the report--and Fox, and that the CI heard about this conversation third hand, *i.e.*, not from either Fox or Bauer.

¶58    Thus, Ayers' contention that "Fox's statements to the confidential informant . . . clearly falls [sic] under the exception to hearsay contained within Rule 804(b)(3), M.R.Evid.," is incorrect. Rule 804(b)(3), M.R.Evid., applies when the declarant--who in this case is allegedly Fox--is unavailable. However, both Fox and Bauer testified during trial, while none of those supposedly in the middle of the story's repetition--all of whom were named in the report--were called as witnesses.

¶59    Significantly, the CI was neither present at the crime scene nor a witness to any alleged criminal activity, which bears on the significance or probative force of the CI's

information. We note that in *Roviaro*, the informant's identity was important because he was the only witness to the transaction Roviaro was accused of committing. *Roviaro*, 353 U.S. at 64. We have concluded that when an undercover informant played a continuous, active, and primary role in the alleged crime, his identity should have been disclosed since his testimony would be relevant to the defendant's assertions of an entrapment defense. *State v. Chapman* (1984), 209 Mont. 57, 68, 679 P.2d 1210, 1215-16. *See also Offerdahl*, 156 Mont. at 439, 481 P.2d at 341-42 (informant who took part in drug transaction was "vital material witness" because significance of informant's testimony was critical in proving guilt or innocence of defendant and his identity should be revealed unless information could be amended to state sufficient facts). Here, the CI was simply not a vital material witness. At best, he merely passed on to others what he heard. *See also U.S. v. Mendoza-Salgado* (10th Cir. 1992), 964 F.2d 993 (disclosure of identity not required when informant did not actively participate in the transaction that generates the charge or his information would be merely cumulative).

¶60    Ayers was provided with the identities of the CI's sources of information and had the opportunity to interview them and call them as witnesses. We conclude that given the information provided Ayers, and the accuracy and thoroughness of the investigative report's summary of the CI's information, denying disclosure of the CI's identity had little if any impact on Ayers' ability to prepare his defense.

¶61    Finally, we disagree with Ayers' assertion that the CI "accurately described" Phyllis's injuries in "every detail." While the CI did correctly describe some of Phyllis's injuries, the

22

CI also told law enforcement that Phyllis had been stabbed in the eye and ear, which was incorrect. Again, this information was not based on any first-hand knowledge and the CI was unable to remember who told him that information. Moreover, we note that testimony during trial indicated that some of the facts detailing the manner of Phyllis's death and the nature of her injuries were rumored about the Livingston Community.

¶62 After considering the crime charged, the possible defenses, the potential significance of the informer's testimony, and other relevant factors, we conclude the District Court did not abuse its discretion when it denied Ayers' motion to compel disclosure of the CI's identity.

**Issue 3**

¶63 **Did the District Court err in denying Ayers' motion to exclude evidence?**

¶64 On December 12, 2000, just before the State's opening statement, Ayers asked the court to instruct the State not to mention evidence concerning the latent palm prints recovered from the December 4, 1999 newspaper, the fragment from the December 4 paper found on Phyllis's hand, or the evidence concerning the throwing knives and carrying case. Ayers argued that he did not have time to prepare for the evidence, explaining to the court that he had received the palm print report on December 4, 2000, and had received the other report--which found that the fragment matched the December 4 paper and that the recovered throwing knives matched the knife case from Martz's apartment--on December 10th. The District Court instructed the State not to mention the evidence in question in its opening statement and asked the parties for briefs on the issue. The next day, the District Court

23

denied Ayers' motion.

¶65    In its order denying Ayers' motion to exclude the evidence, the court noted that both parties agreed that the State had not attempted to hide the evidence.  As to the December 4, 2000 report, the court noted that while Ayers had "ample time, prior to trial, to object to the evidence concerning the palm print, or request a continuance," Ayers failed to do so.  In addition, the court stated that the evidence was always available to Ayers for independent analysis and noted that much of the evidence being objected to was listed on a final report that Ayers referred to in his exhibit list filed on December 8, 2000.

¶66    As for the report Ayers received on December 10, 2000, the court commented that while Ayers did not have the same amount of time to review it as he had for the December 4 material, Ayers still had the opportunity to interview the crime lab witness concerning the lab analysis after receiving the December 10 report on the newspaper fragment and knife sheath. Although the District Court noted its "extreme" concern with the delay in analyzing the evidence in this case, it determined that the delay was not the result of any acts by the State, pointing out that the County Attorney in this case made several efforts to get the evidence analyzed in an expedient manner.  The court stated that Ayers could request a short continuance to provide him adequate time to review the evidence, and suggested that trial could resume on December 26, 2000.  Significantly, Ayers elected to proceed to trial and declined the two-week continuance.

¶67    Ayers argues the District Court's refusal to exclude references to the palm prints, paper fragment, and knife sheath, forced him to choose between his right to prepare a

defense and his right to a speedy trial. However, other than merely asserting that he was forced to make this choice, Ayers provides no argument or legal analysis of his right to a speedy trial. Significantly, Ayers never filed a motion to dismiss based on an alleged violation of his right to speedy trial, presumably because he declined the court's offer of a brief continuance and decided to proceed to trial on December 12.

¶68 We have previously upheld a trial court's refusal to suppress results of reports from the state crime lab that were presented to the defendant one day before the trial. *State v. Higley* (1980), 190 Mont. 412, 426, 621 P.2d 1043, 1052. In *Higley*, while the State was unaware of the results until a day before trial and notified defense counsel that same day, Higley took no action until the matter came up at trial. We noted that even though Higley had learned of the evidence before trial, he failed to request a continuance. Moreover, as here, we noted in *Higley* that there was no evidence that the State purposely attempted to withhold evidence. *See*, *Higley*, 190 Mont. at 426, 621 P.2d at 1052. *See also State v. Golder*, 2000 MT 239, ¶ 11, 301 Mont. 368, ¶ 11, 9 P.3d 635, ¶ 11 (State's noncompliance with discovery order was not willful and resulted in no prejudice to defense and therefore trial court did not abuse its discretion in declining to suppress testimony); and *State v. Van Voast* (1991), 247 Mont. 194, 202, 805 P.2d 1380, 1385 (when no indication of willful noncompliance with discovery statutes, State's disclosure of crime lab witness 24-hours before trial did not warrant exclusion).

¶69 The District Court properly weighed the interests at stake by considering potential prejudice to Ayers and the probative value of the evidence. It offered Ayers additional time

to prepare his defense, and Ayers declined the opportunity. Accordingly, we conclude the court did not abuse its discretion when it denied Ayers' motion to exclude evidence of the latent palm prints found on the newspaper at the crime scene, the newspaper fragment found on the victim's hand, or the two throwing knives and carrying case.

**Issue 4**

¶70 **Did the District Court err in admitting evidence of Ayers' 1990 Wyoming conviction for first degree sexual assault?**

¶71 Officer Chandler Richard (Richard), the Wyoming law enforcement officer who investigated Ayers' first degree sexual assault offense, testified as to the circumstances of that offense. Richard explained that the victim was a seventy-nine year old woman who, along with her ninety-two year old husband, ran a motel. On the night of the assault, Ayers lured the victim out of the motel office and up to his room under false pretenses, by asking her to repair the toilet in his room. As the victim was checking the toilet, Ayers exposed his penis and when she turned around, Ayers told her that he had a knife and that if she screamed he would kill her. Ayers then grabbed the victim, covering her mouth and nose, and forced her to the bed, where he removed her clothing and had sexual intercourse with her. According to the victim, Ayers did not ejaculate during intercourse. During the assault, Ayers told the victim that he had killed before and he would kill again. Afterwards, Ayers asked the victim if she had a car and he followed her to the office to get the car keys. He then left with the car. When Ayers was apprehended, he was still in possession of the victim's car.

26

¶72    Rule 404(b), M.R.Evid., which controls the admissibility of evidence of other crimes, provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

We have consistently stated that a district court has broad discretion when determining whether other crimes evidence is admissible under Rule 404(b), M.R.Evid. *See State v. Whitlow* (1997), 285 Mont. 430, 437, 949 P.2d 239, 244 (citations omitted).

¶73    We originally developed the following four-part test in *State v. Just* (1979), 184 Mont. 262, 602 P.2d 957, and subsequently modified it in *State v. Matt* (1991), 249 Mont. 136, 814 P.2d 52. This Rule is currently referred to as the Modified *Just* Rule and is to be used in determining admissibility of other crimes, wrongs or acts:

> (1) The other crimes, wrongs or acts must be similar.
>
> (2) The other crimes, wrongs or acts must not be remote in time.
>
> (3) The evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity with such character; but may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
>
> (4) Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading of the jury, considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

*Aakre*, ¶ 9 (citing *Matt*, 249 Mont. at 142, 814 P.2d at 56).

¶74    We have previously stated that "[w]hile failure of questioned evidence to meet only one element of the *Just* test is not sufficient to refuse its admission, a decision to admit the evidence should not be made lightly. The four factors must be considered together." *State v. T.W.* (1986), 220 Mont. 280, 284, 715 P.2d 428, 430 (abrogated on other grounds, *State v. Strizich* (1997), 286 Mont. 1, 952 P.2d 1365). *See also State v. Sadowski* (1991), 247 Mont 63, 71, 805 P.2d 537, 542; *State v. Randall*, (1989), 237 Mont. 271, 275-76, 772 P.2d 868, 871; *State v. Hall* (1988), 234 Mont. 57, 61, 761 P.2d 1283, 1285; and *State v. Clausen* (1987), 228 Mont. 20, 22, 740 P.2d 679, 681.

¶75    However, more recently, we have stated that "[e]vidence of other acts must satisfy all four elements of the Modified Just Rule before it can be admitted." *State v. Pace* (1995), 272 Mont. 464, 470, 901 P.2d 557, 560 (citing *State v. Keys* (1993), 258 Mont. 311, 318, 852 P.2d 621, 625). In *Keys*, we concluded that "[b]ecause the evidence is inadmissible under the first and third criteria, it is not necessary to discuss the remaining requirement under the modified *Just* rule." *Keys*, 258 Mont. at 318, 852 P.2d at 625. *See also State v. Rogers*, 1999 MT 305, ¶ 43, 297 Mont. 188, ¶ 43, 992 P.2d 229, ¶ 43; *State v. Sweeney,* 2000 MT 74, ¶ 35, 299 Mont. 111, ¶ 35, 999 P.2d 296, ¶ 35; and *State v. Dobson*, 2001 MT 167, ¶ 36, 306 Mont. 145, ¶ 36, 30 P.3d 1077, ¶ 36.

¶76    We take this opportunity to re-affirm these recent decisions and repeat that all four prongs of the Modified *Just* Rule must be met before evidence of prior acts, crimes or wrongs may be admitted. *See Aakre*, ¶ 9 ("There are four substantive criteria under Rule 404(b), M.R.Evid., that must be met before evidence of other crimes, wrongs or acts can be

28

admitted in the trial of the current charge."); and *State v. Freshment*, 2002 MT 61, ¶ 34, 309 Mont. 154, ¶ 34, 43 P.3d 968, ¶ 34 ("[a]dmissibility of other crimes is determined by satisfying four factors. . . . ").  Therefore, to the extent that our prior case law implies otherwise (*See* cases cited in ¶ 74), those cases are to such extent overruled.

¶77     In addition to satisfying the four substantive requirements of the Modified *Just* Rule, a party offering evidence of prior acts must also comply with the following procedural requirements:

> (1) Evidence of other crimes, wrongs or acts may not be received unless there has been written notice to the defendant that such evidence is to be introduced.  The notice to the defendant shall specify the evidence of other crimes, wrongs or acts to be admitted, and the specific Rule 404(b) purpose or purposes for which it is to be admitted.
>
> (2) At the time of the introduction of such evidence, the trial court shall explain to the jury the purpose of such evidence and shall admonish it to weigh the evidence only for such purposes.
>
> (3) In its final charge, the court shall instruct the jury in unequivocal terms that such evidence was received only for the limited purposes earlier stated and that the defendant is not being tried and may not be convicted for any offense except that charged, warning them that to convict for other offenses may result in unjust double punishment.

*State v. Anderson,* (1996), 275 Mont. 344, 349-50, 912 P.2d 801, 804 (citing *Matt*, 249 Mont. at 142-43, 814 P.2d at 56).

¶78     On appeal, Ayers alleges that *none* of the four substantive prongs of the Modified *Just* Rule were met.  We therefore review whether each of the four elements of the rule were satisfied.

*Similarity*

29

¶79   Ayers argues that the facts underlying the Wyoming conviction are not sufficiently similar to the current charges.  We disagree.  Both women were similar in appearance (elderly-looking and frail), lacked the ability to defend themselves, and were alone when the assault began.  There was evidence that Phyllis had suffered actual or attempted sexual intercourse (citing to the folded paper towel positioned underneath Phyllis. Phyllis's pants and underwear had been removed; her legs were separated; and her shirt had been opened and her bra was pushed up).  In both cases the victim's vehicle was taken following a sexual assault.  Ayers threatened to use a knife in the Wyoming assault, telling the victim he would kill her and her husband if she screamed or reported the assault, and a knife was used to kill Phyllis.  Finally, Ayers had brief contact with both victims prior to the assault (he retrieved a hair dryer from Phyllis two nights before she was killed, while in Wyoming, Ayers went to the motel office under pretense and then lured the victim to his room).

¶80   We have consistently stated that under the first prong of the Modified *Just* Rule, the other crime does not have to be identical to the charged conduct, only sufficiently similar. *Whitlow*, 285 Mont. at 438, 949 P.2d at 244 (citing *State v. Weldy* (1995), 273 Mont. 68, 74, 902 P.2d 1, 5).  Moreover, when determining similarity of the acts or crimes, "we review the acts rather than the charges." *State v. Hagberg* (1996), 277 Mont. 33, 45, 920 P.2d 86, 93 (citing *State v. Brogan* (1995), 272 Mont. 156, 165-66, 900 P.2d 284, 290).  We have also observed that "no set standard has emerged" when reviewing our case law concerning the similarity prong of the Modified *Just* Rule. *Rogers*, ¶ 28 (citing *State v. Hansen* (1980), 187 Mont. 91, 96, 608 P.2d 1083, 1086). Finally, we have recognized that "[t]here is no rigid rule

for determining when conduct is sufficiently similar, rather, the determination of similarity depends on whether the conduct has some relevance to prove an issue in dispute." *Weldy*, 273 Mont. at 75, 902 P.2d at 5 (citation omitted). *See also State v. Henderson* (1996), 278 Mont. 376, 381, 925 P.2d 475, 478-79 (prior offenses involving simulated sexual acts were relevant and sufficiently similar to charged offense, sexual intercourse without consent).

¶81    We have previously held that evidence of prior sexual assaults committed by the defendant against young girls was admissible in showing motive or intent during his trial for sexual intercourse without consent against a nine-year old girl. *State v. McKnight* (1991), 250 Mont. 457, 820 P.2d 1279 (defendant's argument that the crimes of sexual assault and sexual intercourse without consent were not sufficiently similar, was rejected). *See also Whitlow*, 285 Mont. at 438, 949 P.2d at 245 (defendant's prior conviction for sexual assault against daughter [touching daughter's breasts and genitals and attempting sexual penetration] was sufficiently similar to charge of sexual intercourse without consent where defendant penetrated different victim's genitals); and *State v. Medina* (1990), 245 Mont. 25, 30, 798 P.2d 1032, 1035-36, overruled on other grounds by *State v. Olson* (1997), 286 Mont. 364, 951 P.2d 571 (prior act of attempted sexual intercourse was sufficiently similar to charged acts of fondling and forced oral sex against the same victim).

¶82    We conclude that the facts underlying Ayers' prior conviction for sexual assault in the first degree meet the similarity prong of the Modified *Just* Rule.

*Remoteness*

31

¶83    When considering the second prong of the Modified *Just* Rule and evaluating the nearness in time of the prior act or crime, we have stated that "each case must be examined in light of its unique set of facts." *State v. Brooks* (1993), 260 Mont. 79, 83, 857 P.2d 734, 736 (citing *Medina*, 245 Mont. at 30, 798 P.2d at 1036). Moreover, and significant to the case *sub judice*, we have stated that "lack of opportunity makes the time between the prior act and the charged offense less significant." *Whitlow*, 285 Mont. at 438, 949 P.2d at 245 (citing *Brooks*, 260 Mont. at 83, 857 P.2d at 736-37) (since defendant lacked opportunity to re-offend while incarcerated and/or under supervision on parole for five-year period, prior crime was not too remote in time).

¶84    Here, Ayers committed the Wyoming offense in 1989 and was sentenced to the state penitentiary in April of 1990, where he remained until discharged on September 13, 1999. Phyllis was killed approximately three months later. We conclude the District Court did not err in considering Ayers' length of incarceration in its determination that the Wyoming conviction was not too remote in time to meet the second prong.

*Purpose*

¶85    Ayers argues his Wyoming conviction was not connected to the current charges, nor did it give rise to a motive or reason for killing Phyllis. Ayers also contends his prior conviction was inadmissible to prove identity, arguing that a heightened degree of similarity is required for such a purpose. Finally, he argues the State merely recited an allowable purpose--motive--and failed to follow up with its stated purpose during trial.

¶86    The State consistently asserted that it sought to introduce Ayers' prior conviction to

show motive, providing the following theory: the commission of the Wyoming offense--sexual assault and vehicle theft--gave rise to a motive to kill Phyllis during the commission of the instant offense so as to "silence the victim in order to prevent arrest." In its amended notice of intent to introduce evidence of other acts, the State added "identity" as another purpose for introducing Ayers' prior conviction, and argued that while Ayers had withdrawn his intent to use an alibi defense, the State believed Ayers still intended to assert someone else committed the crime, thus making identity an issue.

¶87 We have held that "merely reciting an allowable purpose is not sufficient if the evidence does not further that purpose or that purpose is not an issue in dispute." *Rogers*, ¶ 36 (citing *Keys*, 258 Mont. at 317, 852 P.2d at 625). *See also Dobson*, ¶ 31 (citing *United States v. Mehrmanesh* (9th Cir. 1982) 689 F.2d 822, 830) ("the State 'must articulate precisely the evidential hypothesis by which a fact of consequence may be inferred from the other acts evidence.'"). Therefore, we must look to each purpose identified by the State as pertinent under Rule 404(b), M.R.Evid., for the introduction of evidence of Ayers' prior conviction for first degree sexual assault.

¶88 We look first to motive. We have concluded that for a prior act, crime, or wrong "to be admissible as relevant towards motive, the commission of the first crime or act should give rise to a motive or reason for the defendant to commit the second crime." *Rogers*, ¶ 37 (citation omitted).

¶89 In response to Ayers' contention that the State failed to present any evidence of the "silencing motive" at trial, we emphasize that the purpose behind the notice requirements in

33

the Modified *Just* Rule procedural criteria is to prevent surprise and allow the defendant to prepare for and respond to allegations of previous conduct. *State v. Croteau* (1991), 248 Mont. 403, 408, 812 P.2d 1251, 1254. Here, the State maintained that Ayers' Wyoming conviction was logically relevant in establishing motive for killing Phyllis. The State never changed its theory of motive or introduced a contrary motive, and properly followed the three procedural safeguards, specifically informing Ayers that it intended to introduce evidence of his prior conviction for purposes of proving the specific motive of preventing apprehension by killing the only witness. We conclude that the State's notice to Ayers enabled him to adequately prepare for trial and defend against the introduction of the prior Wyoming conviction. This conclusion, however, does not address Ayers' argument that there was insufficient evidence of motive offered at trial.

¶90 Ayers contends the State failed to present evidence to support its motive theory during the trial. Ayers points to Agent Johnson's testimony as dispositive: when asked the State's theory as to the motive for why Phyllis was killed, Agent Johnson replied, "I believe there are clear indications at the crime scene that sex could have been a motive. I believe that robbery or theft could have been a motive. I believe that somebody needing transportation in the form of a vehicle could have been a motive." Ayers concludes that because Agent Johnson failed to identify silencing the victim as a motive, the State failed to satisfy the third prong of the Modified *Just* Rule.

¶91 Neither the Modified *Just* Rule, nor Rule 404(b), M.R.Evid., set out requirements for how, or to what degree, the State should present evidence of motive during the trial. In

*Aakre*, we noted that *Sweeney* requires "that each allowable purpose under Rule 404(b), M.R.Evid., asserted by the State be analyzed by a trial court to determine whether the evidence supports that specific purpose." *Aakre*, ¶ 11. However, as that excerpt indicates, it is the <u>trial court</u>--not the jury--that must make the pre-trial determination of whether the evidence supports each specific purpose before the evidence will be admitted at trial.

¶92   It is typically quite difficult for anyone, except for the perpetrator himself or herself, to establish direct evidence of a motive. Obviously, Ayers did not testify at trial. Moreover, it is speculative as to whether Agent Johnson, or anyone else for that matter, could lay the proper foundation to testify to motive. However, for purposes of this case, we need not decide whether there was sufficient direct evidence of motive, as the alleged error was waived. In closing argument, when the State argued motive, suggesting that Ayers killed Phyllis to prevent her from becoming a witness against him, Ayers failed to raise any objection as to the absence of evidence to support the State's argument. As we note later in this Opinion, the failure to object at trial results in a waiver of the issue on appeal.

¶93   The State also offered evidence of the prior conviction for the purpose of showing identity. We have explained that when proving the "identity" of the defendant, prior acts or crimes are often introduced "to prove other like crimes by the accused so nearly identical in method as to earmark them as the handiwork of the accused." *State v. Kordonowy* (1991), 251 Mont. 44, 49, 823 P.2d 854, 857. *See also Henderson*, 278 Mont. at 382, 925 P.2d at 479 (where defendant denied guilt and alleged another man committed the offense, identity became a disputed issue and thus evidence of defendant's prior acts was properly allowed

35

to prove defendant was the perpetrator).

¶94     As noted above, the similarities between the Wyoming assault and this crime are striking. Moreover, as Ayers' cross-examination of witnesses at trial was geared toward the suggestion that someone else committed the crime, identity of the perpetrator was clearly at issue. Given the similarities between the two crimes noted above, the District Court did not err in concluding that the State provided sufficient connection between Ayers' prior crime and the charges he faced here. Accordingly, we conclude Ayers' Wyoming conviction meets the third prong of the Modified *Just* Rule.

*Prejudice v. Probative value*

¶95     Finally, Ayers argues that the prejudicial effect of the details from his prior offense outweighed the probative value. Ayers argues that those "excruciating details" painted Ayers as evil and dangerous and were inflammatory and prejudicial, and that the evidence tended to show Ayers acted in conformity with his "bad character" when Phyllis was killed. The State responds by pointing out that Ayers did not object to any of Richard's testimony and argues that in any event, the evidence was not unfairly prejudicial, but rather established the Wyoming victim's frailty, infirmity and inability to defend herself. In reply, Ayers contends his original objection to the introduction of evidence prior to trial preserved this issue for appeal.

¶96     We agree with the State that Ayers failed to properly preserve his contention that the details described by Richard were prejudicial and outweighed any probative value of his prior conviction. At no time during Richard's recitation of the facts surrounding Ayers' first

36

degree sexual assault did Ayers object to the allegedly "excruciating details." Nor did Ayers ever seek to limit the scope of Richard's testimony. We previously declined to address an alleged error when a defendant, who had generally objected to the admission of his prior conviction and to the State's first witness testifying that he was the defendant's probation and parole officer, failed to "raise a specific objection to the State introducing the other crimes evidence through its first witness" or in its case in chief. *Anderson*, 275 Mont. at 350, 912 P.2d at 804-805 (This Court "will not address an alleged error that is deemed waived by lack of timely objection at trial."). *See also Weeks*, 270 Mont. at 85, 891 P.2d at 490 (although motion in limine may preserve a specification of error for appeal, that does not negate the appellant's obligation to make the basis and grounds for his objection clear to the court). Moreover, we will not put a district court in error for an action in which the appealing party acquiesced or actively participated. *State v. Harris*, 1999 MT 115, ¶ 32, 294 Mont. 397, ¶ 32, 983 P.2d 881, ¶ 32 (citing *State v. Clay*, 1998 MT 244, ¶ 24, 291 Mont. 147, ¶ 24, 967 P.2d 370, ¶ 24).

¶97　　In *State v. Ingraham*, we noted that "[w]e have repeatedly 'approved the use of a motion in limine to preserve an objection for appeal, <u>provided the objecting party makes the basis for his objection clear to the district court</u>.'" *Ingraham*, 1998 MT 156, ¶ 36, 290 Mont. 18, ¶ 36, 966 P.2d 103, ¶ 36 (citing *State v. Fuhrmann* (1996), 278 Mont. 396, 403, 925 P.2d 1162, 1166) (emphasis added). Here, while Ayers did file a motion in opposition to the State's intent to present evidence of his prior conviction, he presented only a generic argument as to the prejudicial impact of the conviction; he did not argue that any specific

details from the incident would be exceptionally prejudicial. *See Fuhrmann*, 278 Mont. at 403, 925 P.2d at 1167 (where defendant's "argument before [this Court was] grounded in the same theory as was his argument below," defendant's motion in limine properly preserved his objection).

¶98 Ayers' argument on appeal--that the evidence was prejudicial because of certain details originating from statements by the Wyoming victim and repeated by Richard--is *not* grounded in the same theory as his motion in opposition presented to the District Court below. Ayers was well aware of the State's intent to introduce his prior Wyoming conviction through Richard. Nonetheless, Ayers did not object to the extent or scope of Richard's testimony at trial. Thus, the District Court was not given the opportunity to limit the evidence that Ayers now argues was prejudicial.

¶99 When considering the fourth prong of the Modified *Just* Rule, we have repeatedly noted that probative evidence will frequently and inevitably be prejudicial to a party. *Henderson*, 278 Mont. at 382, 925 P.2d at 479 (citations omitted). However, we have also concluded that although evidence of "other acts" may be prejudicial, when it satisfies the other three Modified *Just* Rule requirements, "such prejudice alone is not a sufficient reason to refuse admission." *Henderson*, 278 Mont. at 382, 925 P.2d at 479 (citation omitted). Moreover, "when the prior crime evidence meets the first three elements of the modified *Just* rule, the prior crime evidence necessarily carries great probative weight." *Hagberg*, 277 Mont. at 45, 920 P.2d at 93 (citations omitted). *See also Brooks*, 260 Mont. at 84, 857 P.2d at 737 and *Anderson*, 275 Mont. at 349, 912 P.2d at 804.

¶100 Ayers' prior conviction clearly had probative value. Moreover, Ayers failed to properly preserve the prejudice objection he now urges us to consider.

¶101 Based on the foregoing, we conclude that all four of the Modified *Just* criteria were met, and that the District Court did not abuse its discretion when it admitted evidence of Ayers' prior conviction in Wyoming for first degree sexual assault.

¶102 Accordingly, Ayers' conviction is affirmed.

/S/ PATRICIA COTTER

We Concur:

/S/ KARLA M. GRAY
/S/ JIM REGNIER

/S/ JAMES C. NELSON
/S/ W. WILLIAM LEAPHART
/S/ JIM RICE

Justice Terry N. Trieweiler specially concurs.

¶103    I concur with the result of the majority Opinion.  However, I do not agree with all that is stated in that Opinion.

¶104    I disagree with the majority's conclusions in ¶¶ 97 and 100 that the Defendant Richard Alan Ayers, Jr., "failed to properly preserve the prejudice objection he now urges us to consider."

¶105    The majority has correctly set forth the rule of law regarding preserving an objection for purposes of appeal by way of a motion in limine.  In *State v. Ingraham*, 1998 MT 156, ¶ 36, 290 Mont. 18, ¶ 36, 966 P.2d 103, ¶ 36, we stated that "[w]e have repeatedly 'approved the use of a motion in limine to preserve an objection for appeal, provided the objecting party makes the basis for his objection clear to the district court.'" (Citing *State v. Fuhrmann* (1996), 278 Mont. 396, 403, 925 P.2d 1162, 1166).  We have further stated in *Fuhrmann* that where a defendant's "argument before [this Court] is grounded in the same theory as was his argument below," defendant's motion in limine properly preserved his objection.  *See Fuhrmann*, 278 Mont. at 403, 925 P.2d at 1167.

¶106    In this case, the State indicated its intent to offer evidence of prior crimes at the omnibus hearing on April 3, 2000.  One week later, on April 10, it filed a formal notice of its intent to offer evidence of the 1990 guilty plea to first degree sexual assault.  On May 16, 2000, the Defendant filed a substantive six-page brief in opposition to the State's stated intent to offer evidence of other crimes.  In that brief, Ayers' attorney set forth the four-part test to determine the admissibility of evidence of other crimes and then applied each part to the facts then known to the parties.  Regarding the prejudicial effect of the prior offense, he argued that:

> The danger of the "improper inference about propensity" (i.e., if he did it before, he must have done this one too) far outweighs any inference that the crimes are so similar that only one person could have committed them.

41

. . . .

> Finally, prong four of the modified *Just* Rule is also unsatisfied, in that even if the court finds this evidence relevant, it may be excluded because it's probative value is substantially outweighed by the danger of unfair prejudice. It is hard to fathom how a defendant who is presumed innocent, must endeavor to overcome the evidence when the jury hears that he has "done it once before."

¶107   It is hard to fathom how a more specific objection to the prior crimes evidence based on its prejudicial effect could be required. As this Court places more and more exacting demands on litigators to specify every trivial detail of the basis for an objection in order to preserve that objection for appeal, this Court creates a burden that cannot be complied with during the normal course of litigation.

¶108   Ayers not only filed the brief and the specific objection previously cited, he renewed his objection on November 20, 2000, after withdrawing his alibi defense and filed a supplemental brief on July 26, 2001, in which he cited *Evert v. Swick*, 2000 MT 191, 300 Mont. 427, 8 P.3d 773, as additional authority.

¶109   In spite of all these efforts to bring to the attention of the District Court the basis for his objection to the evidence of prior crimes, the majority now, in an effort to avoid reaching the issue of whether the evidence was in fact too prejudicial, states that Ayers waived his objection based on prejudice because "he did not argue that any specific details from the incident would be exceptionally prejudicial." ¶ 97. Nothing in our prior jurisprudence requires that a defendant set forth the specific details of a prior event which makes it prejudicial. No reasonable attorney would think that each specific detail of the event had to be objected to separately. The prejudice of the prior event speaks for itself. The issue is simply whether the prejudicial effect of the prior offense outweighs its probative value. I conclude that it did not. However, I also conclude that in the effort

to evade that issue, this Court has added another impractical and unrealistic obstacle to an attorney's effort to preserve his or her objection for appeal. *See also State v. Hoffman*, 2003 MT 26, 314 Mont. 155, 65 P.3d 1013.

¶110 For these reasons, I specially concur in the result of the majority Opinion while I strongly disagree with at least one conclusion stated by the majority in that Opinion.

/S/ TERRY N. TRIEWEILER