

DA 12-0487

IN THE SUPREME COURT OF THE STATE OF MONTANA

2014 MT 139

STATE OF MONTANA,

Plaintiff and Appellee,

v.

DEAN O. CRIDER,

Defendant and Appellant.

APPEAL FROM:     District Court of the First Judicial District,
In and For the County of Lewis and Clark, Cause No. CDC 2011-250
Honorable Kathy Seeley, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Jonathan King, Attorney at Law, Helena, Montana

For Appellee:

Timothy C. Fox, Montana Attorney General, Jonathan M. Krauss, Mary Cochenour, Assistant Attorneys General, Helena, Montana

Leo J. Gallagher, Lewis and Clark County Attorney, Helena, Montana

Submitted on Briefs:  February 12, 2014
Decided:  May 28, 2014

Filed:

_____
Clerk

Justice Michael E Wheat delivered the Opinion of the Court.

¶1     Dean O. Crider (Crider) appeals from the judgment of the Montana First Judicial District Court, Lewis and Clark County, following his jury conviction for felony Sexual Intercourse Without Consent in violation of § 45-5-503(1), MCA; misdemeanor Partner or Family Member Assault (PFMA) (second offense) in violation of § 45-5-206(1)(a), MCA; and felony Tampering With Witnesses and Informants in violation of § 45-7-206(1)(a), MCA.  We affirm.

## ISSUES

¶2     We review the following issues:

*1.  Did the District Court abuse its discretion when it admitted evidence that Crider had previously assaulted and harassed the victim?*

*2.   Should we exercise plain error review to review the District Court's instruction to the jury regarding the evidence of the previous bad acts?*

*3.  Did Crider receive ineffective assistance of counsel when his counsel failed to object to the State's use of the previous bad acts?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3     Crider was M.W.'s high school crush.  The two had been good friends for fifteen years when they started dating, in 2009.  On July 8, 2011, Crider and M.W. took M.W.'s two young children to play at a park.  While they were at the park, M.W. received a text message from an ex-boyfriend of hers that read "Where's my Friday night blow job ☺ LOL."  Crider saw the message.  M.W. testified that the message was supposed to be a joke and would not have meant anything if Crider had not seen the message.  "[B]ut because he was sitting there, it—it meant that there was going to be some not-so-fun stuff happening."  M.W. routinely

2

allowed Crider to look through her phone because he always wanted to know who was calling her and texting her. After seeing the message, Crider became very angry.

¶4 Crider and M.W. drove to M.W.'s mother's house and dropped the children off. Then they went to Crider's house, where they argued for a little while and began drinking shots of Black Velvet whiskey. When they finished the Black Velvet they went to the Libation Station, two blocks from Crider's house, where they ran into friends he knew. M.W. testified that "while we were there, it was like everything was fine and nothing had happened." Crider wanted to go to East Helena to continue socializing with the friends they met at the bar. The two bought a liter of Black Velvet to go and began driving to East Helena. They began arguing en route. While M.W. was driving, Crider began burning her with a cigarette and poured three-quarters of the bottle of Black Velvet over her head. At that point, M.W. testified, Crider had reached a point of anger where "he's just a completely different person. . . . It's like something clicks in his head, and it's just done. There's no changing his mind or calming him down." She explained that she had not recognized his propensity for this kind of anger until about four months into the relationship. M.W. stopped the car and said she would try to fix things, because she loved him. The two returned to Crider's house to try to "work through it."

¶5 At Crider's house, M.W. and Crider drank more Black Velvet. At some point M.W. may have told Crider he could "do whatever he wanted" to her. Crider told her that if she was going to act like a whore he was going to treat her like a whore. He made her take off her clothes and give him oral sex. Because Crider was holding M.W.'s hair and controlling the oral sex, she vomited four or five times. M.W. told Crider to stop. He did not stop.

3

After at least half an hour of this, Crider dragged M.W. into the bathroom by her hair and began having anal sex with her. That did not last very long because "it hurt really bad." M.W. told Crider to stop and he stopped almost immediately. He threw her on the bed and penetrated her vagina with his fist. This, M.W. testified felt "comparable to having a baby." M.W. told Crider to stop and kicked him off her. He grabbed her by her hair and her arms and threw her, naked, out of the house. M.W.'s clothes and car keys were inside the house. She pounded on the door and begged Crider to let her back in, because she loved him and wanted to make it better. After five minutes, Crider let her back in. He pulled her around by the hair, threw her into walls and made her give him more oral sex. Then he threw her out again. This time she went to his mother's house, next door, and hid in the porch. His mother drove her home at 5:30 a.m.

¶6     The next morning, M.W. called the police to ask for help recovering her car and her keys. The police explained they could not do that unless a domestic report was filed. She declined to file a report because she did not want Crider to get in trouble. M.W. and Crider texted back and forth for awhile, then talked to one another. Crider was "apologetic and sorry and said he didn't really remember what happened." They arranged a time when M.W. could get her possessions, but did not see each other again. M.W. did not tell anyone what had happened until she spoke to a friend a few days later. Her friend reported the incident. M.W. made verbal and written statements about the incident to the domestic violence officer with the sheriff's department.

¶7     Eight days after the incident occurred, and at the domestic violence officer's recommendation, M.W. went to the emergency room for an examination. The examination

4

revealed bald spots on M.W.'s head where Crider had pulled out her hair. It also revealed cigarette burns, and bruising around both eyes. M.W. had rug burns and bruises on her knees. She had a bruise and a cut on her side that she believed she got when Crider threw her into a heater. She had abrasions around her anus and inside of her rectum.

¶8 Over Crider's motion in limine, the District Court admitted evidence of previous incidents of violence between M.W. and Crider, narrowly finding it probative of "motive" or "absence of mistake or accident." The court declined to admit several incidents involving Crider with a previous partner. In July 2010, Crider had been convicted of PFMA to an incident with M.W. In January 2011, M.W. reported to law enforcement that Crider had broken down her door. In May 2011 M.W. called law enforcement to report that Crider was continually calling her and was parked in the area in which she lived. And in June 2011, M.W.'s mother called law enforcement to report that Crider was continually calling her phone. The District Court specifically cautioned in its Order ruling on the motion in limine: "If an issue arises about whether offered evidence falls within the parameters of that allowed by this Order, the parties shall bring the matter to the attention of the Court out of the hearing of the jury."

¶9 Between the time when charges were pressed against Crider for his conduct in the July 2011 incident and the trial date, M.W. recanted her allegations against Crider. The defense entered into evidence several text messages M.W. sent to Crider saying that she still loved him and asking to see him before she pressed charges. There were also several photographic text messages of a tattoo of Crider's initials that M.W. got on her chest, after the incident occurred, inside a heart tattoo she had. Because the two were attempting to

reconcile and Crider was influencing her, M.W. said, M.W. made a statement to the domestic violence officer with the sheriff's department that the sex had been consensual, but had been overly rough and aggressive. As part of this effort, and at Crider's urging, M.W. also left several voicemails on Crider's phone to make it seem as though she was at fault for the incident. She said that she had lied about the rape, that she had had an abortion without telling him, and that she was using methamphetamine. She also met with his lawyers to submit a tape recorded statement that she had lied about the rape.

¶10 Both the State and the defense hired experts to testify at trial regarding the psychology of abuse. The State's expert testified that domestic violence is a pattern of controlling behaviors that also includes violence at times to reinforce the control over the other person. The expert testified that often violence between partners will escalate over time—that a person who is not violent at the beginning of the relationship will become violent. Often after parties separate following an incident of domestic violence, the victim, believing the abuser is really sorry, will begin to question whether he or she correctly perceived events and whether his or her actions caused the violence. The expert testified that sometimes victims will recant allegations or minimize the abuse that occurred.

¶11 The defense expert testified that behaviors among abuse victims varied too widely to reliably characterize that behavior. The defense expert further testified that recanting or minimizing allegations of domestic violence does not necessarily mean someone is a victim. On cross examination, however, the defense expert conceded that it is not uncommon for victims of abuse to recant allegations, return to their abusers, or lie to get abusers out of trouble.

6

¶12 During its opening statement, the State explained: "And I can tell you that during this trial you're going to hear from [M.W.], but I'm not 100 percent sure whether what you're going to hear from her about that night when she sits in that chair—what version of it you're going to hear." When M.W. testified, she stated that the July 2011 incident was nonconsensual, giving the original version of events set forth above. She testified that she had recanted her allegations of rape because she still loved Crider and was attempting to reconcile with him. She also testified about the July 2010 PFMA. In that case, Crider had thrown her up against a wall, slammed her head against the hood of his vehicle and thrown her on her face on a gravel road. This occurred because M.W. asked him to leave her house related to his behaviors involving other women, and threatened to call the police when he became physically aggressive. M.W. disobeyed a court order to attend the trial and testify against Crider in that case because she did not want him to go to jail.

¶13 After M.W. testified at trial, the State requested that the District Court instruct the jury as to the other "bad acts." The court read the following instruction to the jury:

> The state has offered evidence that the defendant, at another time, engaged in other crimes, wrongs, or acts. That evidence was not admitted to prove the character of the defendant or show that he acted in conformity therewith. The only purpose of admitting that evidence was to show proof of motive, opportunity, plan, knowledge, identity, or absence of mistake or accident. You may not use that evidence for any other purpose.
> The defendant is not being tried for those other crimes, wrongs, or acts. He may not be convicted for any other offense than that charged in this case.
>
> For the jury to convict the defendant of any other offense than that charged in this case may result in unjust double punishment of the defendant.

When the District Court settled jury instructions, the defense confirmed it had no objection to the prior bad acts instruction "as requested by the parties." When the final instructions

7

were read, the court said it would not read the other preliminary instructions that had already been read, but re-read the one on prior bad acts for emphasis. The State, in its closing statement, used the prior bad acts evidence to imply that M.W. was a victim of domestic violence.

## STANDARDS OF REVIEW

¶14 This Court reviews a district court's ruling regarding the admission of other crimes, wrongs, or acts for an abuse of discretion. *State v. Green*, 2009 MT 114, ¶ 14, 350 Mont. 141, 205 P.3d 798. To the extent the court's ruling is based on an interpretation of an evidentiary rule or statute, our review is de novo. *Puccinelli v. Puccinelli*, 2012 MT 46, ¶ 12, 364 Mont. 235, 272 P.3d 117.

¶15 We review jury instructions to determine whether the instructions as a whole fully and fairly instruct the jury on the applicable law. *State v. Ring*, 2014 MT 49, ¶ 13, 374 Mont.109, ___ P.3d ___. District courts are given broad discretion when instructing a jury and reversible error occurs only if the jury instructions prejudicially affect the defendant's substantial rights. *Ring*, ¶ 13.

¶16 Claims of ineffective assistance of counsel (IAC) present mixed questions of law and fact that we review de novo. *Green*, ¶ 14.

## DISCUSSION

¶17 *1. Did the District Court abuse its discretion when it admitted evidence that Crider had previously assaulted and harassed the victim?*

¶18 Crider argues that the District Court abused its discretion in admitting the evidence of his prior bad acts to prove motive and absence of mistake or accident. The State counters

8

that Crider did not properly preserve this issue for appeal because he never objected to the prior bad acts evidence on the basis that the District Court improperly admitted it to show motive or absence of mistake.

¶19 A motion in limine has "special advantages" and serves an important strategic purpose. *State v. Ingraham*, 1998 MT 156, ¶ 36, 290 Mont. 18, 966 P.2d 103. We have encouraged the use of motions in limine to preserve objections in cases where "[a] party may not wish to register an objection in the presence of the jury for tactical reasons, yet may wish to preserve the objection on appeal." *Ingraham*, ¶ 36. A party raising an objection through a motion in limine "need not continually renew the objection to preserve alleged errors for appeal." *Hulse v. Dept. of Justice*, 1998 MT 108, ¶ 46, 289 Mont. 1, 961 P.2d 75.

¶20 To preserve an objection for appeal through use of a motion in limine, the objecting party must make the basis for his objection clear to the district court. *Ingraham*, ¶ 36. A district court will not be put in error where it was not given an opportunity to correct itself. *State v. Weeks*, 270 Mont. 63, 85, 891 P.2d 477, 490 (1995). "To preserve a pretrial objection for appeal through a motion in limine, the motion must be 'sufficiently specific as to the basis for the objection.'" *State v. Stock*, 2011 MT 131, ¶ 45, 361 Mont. 1, 256 P.3d 899 (quoting *State v. Vukasin*, 2003 MT 230, ¶ 29, 317 Mont. 204, 75 P.3d 1284). The motion in limine must specify the evidence to which the defendant is objecting. *See Vukasin*, ¶¶ 35-37 (motion in limine was not sufficient to preserve an issue for appeal where it only sought to exclude any "reference, comment, allusion or statement made to any crime, wrong or act pursuant to M.R. Evid. Rule 404(b)" and did not specify the basis for the objection) (quotation omitted).

9

¶21    In *State v. Dist. Court of the Eighteenth Judicial Dist.*, 2010 MT 263, ¶ 49, 358 Mont. 325, 246 P.3d 415, we set forth the process governing admission of Rule 404(b) evidence. First, the prosecution discloses to the defendant the evidence it plans to introduce. *Eighteenth Judicial Dist.*, ¶ 49. This is only a disclosure requirement; the prosecution is not required to explain why the evidence is admissible. *Eighteenth Judicial Dist.*, ¶ 49. After disclosure has occurred, the defendant may, via motion in limine, explain why the evidence should be excluded as irrelevant, unfairly prejudicial, relevant only for an improper propensity inference or otherwise inadmissible. *Eighteenth Judicial Dist.*, ¶ 49. Then, the prosecutor must respond to the defendant's objections and demonstrate the evidence's admissibility. *Eighteenth Judicial Dist.*, ¶ 49. The court should conduct a hearing and issue a written decision with appropriate findings of fact and conclusions of law. *Eighteenth Judicial Dist.*, ¶ 49.

¶22    In this case, in the first step, Crider was placed on notice of the evidence the prosecution intended to introduce during the normal course of discovery, when the State turned over a number of police reports against him. Those reports dated back to 2004 and involved Crider and a former girlfriend as well as Crider and M.W. Crider knew the State intended to introduce this "evidence of crimes, wrongs, or acts pursuant to M.R.Evid. 404" when, in the second step under the foregoing process, he filed the brief supporting his motion in limine. His brief specified that its purpose was to raise "objection to any such effort." Specifically, Crider's brief referenced the reports dating back to 2004 and highlighted the danger of bad acts evidence: That it could lead a jury to conclude that, because the defendant had engaged in past bad conduct, his character showed he had committed the

10

crimes at issue. Because he did not know the precise Rule 404(b) exceptions on which the State intended to rely to introduce the evidence, the motion set forth general grounds for excluding Rule 404(b) evidence and opposed the evidence pursuant to Rule 403, on the grounds that it was more prejudicial than probative. Taking the third step noted above, the State responded, setting forth the specific evidence it sought to introduce and the argument that the evidence was admissible to show motive and absence of mistake or accident. Crider did not file a reply brief and neither party requested a hearing. Less than two weeks before trial, the District Court ruled on the motion, concluding that only the proposed evidence of prior acts involving M.W. was admissible, to show motive or absence of mistake or accident. The District Court excluded Crider's bad acts with partners other than M.W.

¶23 We conclude that Crider's motion in limine was sufficiently specific to preserve his objection to the bad acts evidence for appeal. Crider's brief made clear that he was objecting to the prior bad acts evidence because it could lead the jury to make an impermissible character inference, which is the essence of his argument on appeal. It also specifically referred to evidence of acts from between 2004-2007—evidence the District Court excluded. These arguments made the substance of, and basis for, Crider's objection to the prior bad acts evidence sufficiently clear that the District Court was able to address them. Further, it is evident from the court's order in limine that it was able to grasp the theory and basis for Crider's motion, as the court granted his motion in part by excluding all bad acts evidence involving victims other than M.W., but denied the motion as to acts involving M.W. This case is thus different from others like *Vukasin*, where the District Court was not directed to the issue the defendant sought to raise on appeal. Because the facts and chronology before

11

us establish that the parties followed the steps outlined in *Eighteenth Judicial Dist.*, and the District Court was able to make an informed ruling on Crider's motion in limine, we address Crider's contention that the evidence was improperly admitted on its merits.

¶24  Evidence of prior bad acts by a defendant is admissible as long as it is not offered or used for an improper purpose. To this end, Rule 404(b), provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

In *State v. Stewart*, 2012 MT 317, ¶ 65, 367 Mont. 503, 291 P.3d 1187, we explained that the use of prior bad acts evidence to prove the commission of the crime at issue (or "actus reus") does not necessarily run afoul of Rule 404(b). Rather, the rule prohibits a theory of admissibility: Using propensity evidence to draw "the inference from bad act to bad person to guilty person." *Stewart*, ¶ 61. Rule 404(b)'s prohibition "'applies only when that ultimate inference [of conduct] is coupled with the intermediate inference of the defendant's personal, subjective character. If the prosecutor can arrive at an ultimate inference of conduct through a different intermediate inference, the prohibition is inapplicable.'" *Stewart*, ¶ 65 (quoting Edward J. Imwinkelried, *Uncharged Misconduct Evidence* vol. 1, § 4:1, 4-5 to 4-6 (rev. ed., Thomson Reuters/West 2009)).

¶25  Contrary to the premise underlying Crider's motive argument, a prior bad act need not give rise to a motive or reason for the defendant to commit the crime charged. *Eighteenth Judicial Dist.*, ¶ 59. In *Eighteenth Judicial Dist.*, ¶ 59, we explained that a prior bad act may evidence the existence of a motive without supplying the motive. In such cases, the motive

12

is the cause and both the prior acts and the act at issue are effects. *Eighteenth Judicial Dist.*, ¶ 59. The prosecutor uses the prior bad acts to show the existence of the motive and the motive strengthens the inference that the defendant committed the crime charged. *Eighteenth Judicial Dist.*, ¶ 59.

¶26 Here, the State argues on appeal that the prior bad acts evidence showed "Crider's motive to exert power and control over his victim, and to use force to do so[.]" The jury heard testimony from the State's expert that domestic violence generally involves issues of power and control; and that "[s]exual violence is often included as a way to demean the partner and maintain that control." The prior incident of physical violence occurred in Crider's attempt to control M.W. by preventing her from leaving him and preventing her from calling the police. Breaking down M.W.'s door is an act that exerts control over M.W.'s physical space. Crider's constant phone calls to M.W. and lurking outside her place of residence tend to show Crider's desire to control M.W.'s movements by monitoring her location. His constant calls to her mother exert control over her by harassing her relatives. The motive of exerting power and control is common to the prior acts admitted and is probative of Crider's motive as to the sexual acts at issue in this case.

¶27 For similar reasons, the incidents speak to absence of mistake or accident and are admissible because they refute an aspect of Crider's affirmative defense. Part of Crider's defense is that he and M.W. frequently engaged in rough sex and that the sex on the occasion at issue was consensual. In other words, Crider claims that if he exceeded her consent, he did so by accident. The evidence of prior incidents showing Crider's motive to exert power and control over M.W. refutes that argument. In *Eighteenth Judicial Dist.*, we permitted

13

evidence that a mother accused of killing her child had mistreated the child in the past, when the mother suggested the child's death was accidental. *Eighteenth Judicial Dist.*, ¶ 61. Similarly, here, the State may present evidence that tends to refute Crider's characterization of the brutalization he forced M.W. to endure as mistaken or accidental.

¶28 The Dissent relies on *State v. Keys*, 258 Mont. 311, 852 P.2d 621 (1993), to argue that "the defendant's motive or intent is not relevant where the only issue is whether the victim consented to the sexual intercourse." That argument falls flat because *Keys*, which predates *Eighteenth Judicial Dist.*, is factually distinguishable, and the question of whether M.W. consented is not the only issue here. *Keys* concerned whether an incident involving indecent exposure and assault by the defendant with another victim was admissible as evidence that he had committed the sexual intercourse without consent at issue in that case. *Keys*, 258 Mont. at 316, 852 P.2d at 624. We concluded that the evidence was not relevant where the only issue was whether the alleged rape victim consented. *Keys*, 258 Mont. at 316, 852 P.2d at 624. Here, however, the State sought to admit Crider's prior incidents with M.W. as probative of Crider's motive to control or harass M.W. Such a motive was relevant, not only to Crider's motive as to the sex acts alleged, but also to his motive to commit the offenses of PFMA and witness tampering with which he was also charged related to this incident. Thus, unlike in *Keys*, where the only crime charged was sexual intercourse without consent, M.W.'s consent is not the only issue. M.W., unlike the victim in *Keys*, was also the victim of the prior bad acts the prosecution sought to admit. The District Court excluded the evidence we found improper in *Keys*—evidence of the defendant's prior acts with someone other than the victim. The evidence of Crider's prior acts with M.W., however, was relevant

14

and probative as to his motive to harass and control her. Accordingly, we conclude that the District Court did not abuse its discretion in determining that Crider's prior acts were admissible to show motive or absence of mistake or accident.

¶29  2. *Should we exercise plain error review to review the District Court's instruction to the jury regarding the evidence of the previous bad acts?*

¶30  Where a defendant has not preserved an issue for appeal, this Court may, at its discretion, exercise plain error review to review an alleged error. We invoke the plain error doctrine sparingly, on a case-by-case basis. *State v. Daniels*, 2011 MT 278, ¶ 32, 362 Mont. 426, 265 P.3d 623. "For plain error review of an unpreserved issue, the appealing party must (1) show that the claimed error implicates a fundamental right and (2) 'firmly convince' this Court that failure to review the claimed error would result in a manifest miscarriage of justice, leave unsettled the question of the fundamental fairness of the trial or proceedings, or compromise the integrity of the judicial process." *Daniels*, ¶ 32.

¶31  Crider argues that the District Court improperly instructed the jury that the evidence could be considered to prove motive, opportunity, plan, knowledge, identity, or absence of mistake or accident, when the court had previously ruled that the evidence could be considered only to prove motive or absence of mistake or accident. Citing no authority, he argues that this alleged error violated his fundamental right to due process of law guaranteed by the United States and Montana Constitutions. This, in his view, leaves unsettled the fundamental fairness of his trial and warrants plain error review.

¶32  Not only did Crider twice fail to object to the jury instruction in question, he acquiesced to it both times it was read at trial. The record shows that the purpose for which

15

the instruction was offered was not to expand the types of use the jury might make of the evidence, but rather to limit them. The instruction stressed: "The Defendant is not being tried for those other crimes, wrongs or acts. He may not be convicted for any other offense than that charged in this case." The jury instruction specifically provided that the evidence "was not admitted to prove the character of the Defendant or to show he acted in conformity therewith." It accurately restated the law's provision that evidence of other crimes, wrongs or acts may be used to prove, for instance, motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. While the jury instruction could have been more specific about the purposes for which the evidence could be considered in this case, it adequately served the underlying Rule 404 purpose of barring the "inference from bad act to bad person to guilty person." *See* Stewart, ¶ 61; Eighteenth *Judicial Dist.*, ¶ 47. Crider has failed to convince this Court that the jury instruction leaves unsettled the fundamental fairness of the proceedings and we decline to exercise plain error review.

¶33    *3. Did Crider receive ineffective assistance of counsel when his counsel failed to object to the State's use of the previous bad acts?*

¶34    This Court has adopted the two-pronged test of *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984), in judging IAC claims. *State v. Kougl*, 2004 MT 243, ¶ 11, 323 Mont. 6, 97 P.3d 1095. To show IAC, a defendant must prove both (1) that counsel's performance was deficient, and (2) that counsel's deficient performance prejudiced the defense. *Whitlow v. State*, 2008 MT 140, ¶ 10, 343 Mont. 90, 183 P.3d 861. A defendant must satisfy both prongs of this test in order to prevail on an IAC claim. *Whitlow*, ¶ 11. There is a strong presumption that an attorney's conduct falls within the wide range of

16

reasonable professional service, and the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered a sound trial strategy. *Whitlow*, ¶ 15. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct and to evaluate the conduct from counsel's perspective at the time. *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065. The question, however, is not merely whether counsel's conduct flowed from strategic decisions and trial tactics but whether it was based on reasonable professional judgment. *Whitlow*, ¶ 19.

¶35 Generally, this Court will only consider IAC claims raised on direct appeal where the record reveals the reasoning underlying a counsel's actions or omissions. *State v. White*, 2001 MT 149, ¶ 20, 306 Mont. 58, 30 P.3d 340; *see State v. Aker*, 2013 MT 253, ¶ 22, 371 Mont. 491, 310 P.3d 506 (only record-based IAC claims are reviewable on direct appeal). This is because the question of whether counsel's conduct was based on the exercise of reasonable professional judgment generally demands that we inquire why counsel acted as alleged. To determine whether an IAC claim can be considered on direct appeal, we seek to answer that question by reference to the record. *Aker*, ¶ 34. We have explained that "a non-record based act or omission by counsel may actually include a failure to object to the admission of evidence which is evidenced by the record." *White*, ¶ 16.

¶36 We will also consider IAC claims on direct appeal where counsel is faced with an obligatory, non-tactical action, or there is no plausible justification for defense counsel's actions. *Kougl*, ¶ 15. In those cases, the question is not "why," but "whether" the counsel acted, and if so, if counsel acted adequately. *Kougl*, ¶ 15. "Whether the reasons for defense

17

counsel's actions are found in the record or not is irrelevant. What matters is that there could not be any legitimate reason for what counsel did." *Kougl*, ¶ 15. Such situations are "relatively rare." *Kougl*, ¶ 15.

¶37 Crider argues that there was no plausible justification for his counsel's failure to object to the State's use of the bad acts evidence at trial. He argues that the District Court admitted the bad acts evidence narrowly, to show that Crider had a motive to harm, control and harass M.W. and to show that M.W.'s injuries did not stem from an accident or mistake. The State improperly used the evidence to establish M.W. as a victim of domestic violence and thereby cure her "credibility problems," he alleges. This use, he claims, exceeded the purposes for which the court had authorized the evidence could be used under the Rule 404(b) exceptions. His counsel's failure to object to the State's use of this evidence, he asserts, was inexcusable and prejudiced his defense.

¶38 We are not persuaded that Crider's counsel's failure to object to the State's use of the bad acts evidence at trial was unjustifiable. We have generally recognized that the timing and number of objections is a matter of counsel's tactical discretion. *Aker*, ¶ 35. "An attorney is not required to make all possible objections during a trial, and may legitimately decide to forego certain objections as a matter of trial tactics." *State v. Morsette*, 2013 MT 270, ¶ 19, 372 Mont. 38, 309 P.3d 978. To hold that Crider's counsel was obligated to object to the State's use of the evidence would gut this principle and we decline to do so.

¶39 This matter is suitable for consideration on direct appeal because the record is sufficient to evaluate Crider's IAC claim related to his counsel's alleged omission. Rule 404(b) only bars the use of prior acts evidence to show action in conformity with propensity.

18

*See Stewart*, ¶ 61.  Pursuant to Rule 402, all relevant evidence is admissible.  M. R. Evid. 402.  The Montana Rules of Evidence define relevant evidence as follows:

> Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. *Relevant evidence may include evidence bearing upon the credibility of a witness or hearsay declarant.*

M. R. Evid. 401 (emphasis added).  The prior acts evidence was admissible to reflect on M.W.'s credibility, because the District Court had already concluded, pursuant to Rule 403, that its probative value outweighed the danger of prejudice.  No grounds for an objection to the State's use of the evidence existed and Crider's counsel was not ineffective for failing to make one.

¶40    Even if this were not the case, however, the record reveals that Crider's counsel's actions, taken in context, were not ineffective.  Crider made use of the motion in limine to attempt to exclude evidence of prior bad acts.  When that motion was unsuccessful, Crider adjusted his trial strategy accordingly.  Rather than objecting to the evidence at every turn, knowing those objections would be overruled, Crider chose to challenge the State's use of that evidence to show that M.W.'s inconsistent testimony could be explained by domestic violence.  In light of this tactical change, which was prompted by the denial of his motion in limine, Crider understandably chose not to raise repeated objections to the very evidence on which his own expert witness had based an opinion.  This is precisely the circumstance in which preserving an objection via a motion in limine is of particular tactical advantage. *Ingraham*, ¶ 36.  We conclude that the failure to object to the State's use of the evidence was

within the range of competent professional assistance, particularly considered in light of Crider's trial strategy.

¶41    Accordingly, Crider's IAC claim must fail.

**CONCLUSION**

¶42    We affirm in all respects the District Court's decision.

/S/ MICHAEL E WHEAT

We Concur:

/S/ MIKE McGRATH
/S/ PATRICIA COTTER
/S/ BETH BAKER

Justice Laurie McKinnon, dissenting.

¶43    In my opinion, Crider presents credible arguments that the evidence of his prior domestic abuse should not have been admitted under theories of "motive" or "absence of mistake or accident" to substantively prove his guilt of the charged offenses. Moreover, it is my view that, had the District Court been presented with the analysis which Crider now presents on appeal, the District Court's ruling on the uncharged misconduct evidence likely would have been different. However, the first time that any court has been asked to consider Crider's arguments as to why the particular Rule 404(b) theories do *not* apply is in the present appeal, long after Crider's trial ended.

¶44    While our decision in *State v. Eighteenth Judicial District Court*, 2010 MT 263, 358 Mont. 325, 246 P.3d 415, significantly altered the procedural requirements for objecting to other-acts evidence from what had previously been established under *State v. Just*, 184 Mont.

20

262, 602 P.2d 957 (1979), and *State v. Matt*, 249 Mont. 136, 814 P.2d 52 (1991), it did not alter our well-established precedent requiring the defense to state with specificity the bases for its objections to such evidence. In fact, the procedures we established in *Eighteenth Judicial District Court* reaffirmed that the defense must specify its objections to the evidence of other crimes, wrongs, or acts—and the particular reasoning for those objections—in the district court. The Court's approach in today's decision undermines this requirement and our longstanding precedent which states that we will not consider arguments raised for the first time on appeal. *State v. Homer*, 2014 MT 57, ¶ 12, 374 Mont. 157, 321 P.3d 77; *State v. Lotter*, 2013 MT 336, ¶ 31, 372 Mont. 445, 313 P.3d 148; *State v. Stops*, 2013 MT 131, ¶ 33, 370 Mont. 226, 301 P.3d 811; *State v. Kelm*, 2013 MT 115, ¶ 35, 370 Mont. 61, 300 P.3d 687; *State v. Lewis*, 2012 MT 157, ¶ 22, 365 Mont. 431, 282 P.3d 679. I accordingly dissent.

### Whether the Issue was Preserved for Review

¶45 Prior to *Eighteenth Judicial District Court*, a prosecutor was required to sort through the State's evidence, ascertain whether any of it might be objectionable under Rule 404(b), and give the defendant notice of that evidence before the omnibus hearing.[1] *Eighteenth Jud. Dist. Ct.*, ¶¶ 40-41 (discussing the notice rules under *Just*, 184 Mont. at 274, 602 P.2d at 963-64, and *Matt*, 249 Mont. at 142-43, 814 P.2d at 56); *see also* § 46-13-109, MCA (2009), *repealed*, Laws of Montana, 2011, ch. 130, § 2. The prosecutor had to identify the potentially objectionable evidence, specify the purposes for which it was being offered, and

---

[1] M. R. Evid. 404(b) states: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

apprise the defendant why the evidence was admissible under the purposes stated. The defendant then would respond to the prosecutor's notice, arguing that the notice was deficient, that the evidence was not admissible under the prosecutor's theories, or both.

¶46 We determined in *Eighteenth Judicial District Court* that this procedure was problematic for various reasons. "For one thing, it put[ ] the prosecutor in the position of having to justify the admission of evidence in the absence of any objections by the defendant." *Eighteenth Jud. Dist. Ct.*, ¶ 44. It forced the prosecutor to "identify any prosecutorial evidence" to which the defense might object and to "anticipate what the defense objections might be." *Eighteenth Jud. Dist. Ct.*, ¶ 45. "It also relieve[d] defense counsel of her duty to diligently prepare a defense for her client, to seek discovery of the State's case, to determine which of the State's evidence may be inadmissible, and then to raise any viable evidentiary issues before trial." *Eighteenth Jud. Dist. Ct.*, ¶ 46.

¶47 We concluded that the better approach would be for these evidentiary issues to be raised initially by the defense. *Eighteenth Jud. Dist. Ct.*, ¶ 49. We therefore overruled *Just* and *Matt* and adopted the following procedures. The State first must disclose to the defendant the witnesses and evidence it may introduce at trial. The defendant then must identify any of the State's evidence that he believes should be excluded as irrelevant (Rule 402), unfairly prejudicial (Rule 403), relevant only for an improper propensity inference (Rule 404), or inadmissible under some other rule, and "explain with argument and authority why the evidence should be excluded." *Eighteenth Jud. Dist. Ct.*, ¶ 49. We noted that this may be accomplished through a motion in limine. *Eighteenth Jud. Dist. Ct.*, ¶ 49. The prosecutor next must respond to the defendant's objections and identify a valid,

22

nonpropensity purpose for which the evidence may be admitted. *Eighteenth Jud. Dist. Ct.*,

¶ 49. Lastly, implicit in this framework and consistent with our precedent generally requiring specificity in order to preserve error, if the defendant believes that the particular Rule 404(b) theory or nonpropensity purpose identified by the prosecutor is invalid, then the defendant must advance his theory of inadmissibility, beyond a mere generalized Rule 404(b) objection, in order to preserve the issue for review. Indeed, without a response from the defendant, the district court is left with an uncontested argument by the State for admitting the evidence under a given nonpropensity theory.

¶48    Unfortunately, this procedure was not fully complied with in the present case. Through the normal course of discovery, Crider was given notice of the State's evidence, which included over 50 police reports dating back to 2004. Additionally, in the Omnibus Hearing Memorandum (filed December 20, 2011), the prosecutor expressly stated that she intended to introduce evidence of other crimes, wrongs, or acts. The Omnibus Hearing Memorandum set forth a timeline for the parties' briefing on this issue: Crider's initial brief was due on January 6, 2012; the State's response brief was due ten days after Crider's brief was served; and Crider's reply brief was due five days after the State's brief was served. The District Court specifically contemplated a reply brief from Crider addressing the nonpropensity theories proposed by the State.

¶49    Crider filed his initial brief on January 6, 2012. However, he did not identify with specificity what evidence he was objecting to. Instead, observing that "[a]pparently, the State will attempt, at trial, to bring into evidence prior criminal or wrongful conduct of the Defendant," Crider presented a generalized argument that any such evidence cannot be used

23

"to establish the Defendant's character and conduct in the instant case conforms to his character and conduct in prior incidents of bad acts." Of course, this assertion just restates what Rule 404(b) already says: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." The Court contends that Crider's brief referenced the reports dating back to 2004. Opinion, ¶ 22. This reference, however, appeared in the second-to-last paragraph of the brief's Discussion section, where Crider opined that "[c]ertain of the conduct which we believe the State will no doubt attempt [to] bring forth dates back to 2004. Most of it occurred circa 2004 to 2007." Concerning this evidence, Crider merely asserted: "Quite simply, the information is stale" and "creates the real risk of swaying the jury into penalizing the Defendant for his past bad character."

¶50    In my view, this brief is inadequate under *Eighteenth Judicial District Court*. It is not the prosecution's responsibility to identify which of the State's evidence the defense might find objectionable under Rule 404(b). Indeed, identifying whether a particular piece of evidence even constitutes "[e]vidence of other crimes, wrongs, or acts" is "a task which our cases show is not always straightforward." *Eighteenth Jud. Dist. Ct.*, ¶ 45. Largely for this reason, we put the onus on *the defendant* to identify specifically which evidence he finds objectionable and to make "specific, legally supported objections" explaining why that evidence should be excluded. *Eighteenth Jud. Dist. Ct.*, ¶¶ 49, 72. The system does not function properly when the defendant's brief/motion provides only vague references to the State's evidence and asserts generalized objections that other-acts evidence cannot be used to show action in conformity with character. Merely reciting the dangers of other-acts evidence

24

proves nothing. We clearly contemplated in *Eighteenth Judicial District Court* something more than the sort of generalized arguments Crider provided in this case.

¶51 But even assuming, for the sake of discussion, that Crider's brief was sufficient in identifying the police reports, I still do not agree with the Court that he preserved his present arguments for our review. The State filed its response brief on January 17, 2012. In it, the prosecutor referred to domestic disturbance calls to law enforcement from 2004 through 2007 involving Crider's former girlfriend. The prosecutor also detailed calls to law enforcement involving M.W. beginning in July 2010 and continuing into 2011. The prosecutor listed several theoretical purposes for introducing this evidence: "to show that Crider had a motive, intent, and plan to harm, control, and harass the victim, M.W., and that her injuries were not a result of any accident or mistake that occurred on the date of the offense." The prosecutor, focusing primarily on the motive and plan theories, argued that Crider had "a motive to harass and intimidate" M.W. in order to control her and that his abuse of M.W. was "part of Crider's common scheme, plan, and intent to control the women in his life."

¶52 Despite the briefing schedule set forth in the Omnibus Hearing Memorandum, Crider did not file a reply brief. Since neither party had requested a hearing, the District Court proceeded to issue its decision on February 1, 2012. The court excluded any police reports involving other women, reasoning that such evidence "is more in the nature of demonstrating a trait of bad character." The court ruled, however, that the police reports involving M.W. were probative of motive and absence of mistake or accident.

¶53　Due to his failure to file a reply brief in the District Court, the first time Crider presented an argument challenging the prosecutor's theories for admitting the evidence of his prior domestic abuse is in his opening brief on appeal. I disagree with the Court's decision to sanction this approach. Once the prosecutor has articulated a nonpropensity theory for admitting the evidence, the defendant's failure to present any counterargument forfeits a claim of error (regarding that evidence) on appeal. *Homer*, ¶ 12; *Lotter*, ¶ 31; *Stops*, ¶ 33; *Kelm*, ¶ 35; *Lewis*, ¶ 22. If, as the Court tacitly holds, the defendant need not respond to the prosecutor's brief with an analysis opposing the prosecutor's proposed theory, then the trial court will be left with a one-sided argument from the State, and the defendant will be able to challenge the trial court's decision with arguments presented for the first time on appeal. As we have explained, it is fundamentally unfair to fault the trial court for failing to rule on an argument it was never given the opportunity to consider. *City of Missoula v. Moore*, 2011 MT 61, ¶ 13, 360 Mont. 22, 251 P.3d 679. Had the District Court been presented with the detailed arguments that Crider is now making, the court very well might have decided to exclude the evidence, thereby eliminating any need for Crider to assert this on appeal as an alleged error in his trial. Crider should not be permitted to fault the District Court for failing to rule in his favor on arguments he never presented to that court.

¶54　In *State v. Vukasin*, 2003 MT 230, 317 Mont. 204, 75 P.3d 1284, we held that generalized motions in limine which broadly object to any "reference, comment, allusion or statement made to any crime, wrong or act pursuant to M.R.Evid. Rule 404(b)" are insufficient to preserve a Rule 404(b) issue for appellate review. *Vukasin*, ¶¶ 35-38. The trial court must be "alerted" to the specific testimony or evidence that the defendant finds

26

objectionable and apprised of the defendant's specific theory for excluding that testimony or evidence. *Vukasin*, ¶¶ 35, 37. Our decision today undermines these requirements. The Court effectively approves the use of standardized motions in limine which object in general terms to the introduction of other-acts evidence. Conceivably, we have retreated from the procedural advancements of *Eighteenth Judicial District Court* by once again requiring prosecutors to divine which evidence the defendant finds objectionable under Rule 404(b) and to specify a basis for admissibility. Furthermore, we have chosen to review a district court's evidentiary ruling based on arguments that were not presented to the district court in the first instance. I agree with the State's contentions in its appellate brief that Crider's Rule 404(b) claim is not properly before us. I dissent from the Court's procedural ruling allowing Crider to pursue that claim on appeal. Opinion, ¶¶ 22-23.

### Whether the State's Nonpropensity Theories are Valid

¶55 Given that the Court has addressed the merits of Crider's claim, I believe the Court misuses theories of "motive" and "absence of mistake or accident" to hold that Crider's uncharged misconduct was admissible to prove the charged misconduct.

¶56 The State charged Crider with four offenses: sexual intercourse without consent, partner or family member assault, criminal mischief (of which he was acquitted), and tampering with witnesses and informants. In arguing that the evidence of Crider's past domestic abuse should be admitted, however, the State was unclear about which elements of which offenses this evidence was offered to prove. Moreover, while the State argued that the evidence would show motive and absence of mistake or accident, the State failed to explain precisely how these purposes were probative of a fact in dispute. *See State v. Ayers*, 2003

27

MT 114, ¶ 87, 315 Mont. 395, 68 P.3d 768. On appeal, the State posits that the evidence was admissible to show that Crider intended to commit "injurious sex acts" and that M.W. did not consent to those acts. The Court similarly focuses on "the sexual acts" and whether they were consensual. Opinion, ¶¶ 26-27. Accordingly, I likewise address whether Crider's uncharged misconduct was relevant, under theories of motive and absence of mistake or accident, in proving the sexual acts and whether M.W. consented to them.

¶57    Motive is rarely an element of a crime. It is, however, an intermediate, evidentiary fact that can be used to establish an ultimate fact in the case. David P. Leonard, *The New Wigmore: Evidence of Other Misconduct and Similar Events* § 8.1, 488 (Aspen 2009); Edward J. Imwinkelried, *Uncharged Misconduct Evidence* vol. 1, § 3:15, 3-95 (rev. ed., Thomson Reuters/West 2009). There are two ways in which uncharged misconduct can be used under a motive theory. In the first, the uncharged act supplies the motive for the charged act. In a homicide prosecution, for example, evidence that the defendant was involved in a prior theft may be relevant under a motive theory where, prior to her death, the homicide victim learned of the defendant's involvement in the theft and threatened to report it to authorities. The theft and the victim's knowledge of it furnish a motive for the defendant to prevent the victim from revealing the theft, which supports the inference that the person responsible for the victim's death is the defendant. Leonard, *Evidence of Other Misconduct and Similar Events* § 8.2, 491-92. Many other persons presumably had no motive to murder the victim; thus, the fact that the defendant did have a motive for killing the victim raises the probability that the defendant is the one who did so. Imwinkelried, *Uncharged Misconduct Evidence* § 3:15, 3-97.

28

¶58     Under the second method, the uncharged act does not provide the motive for the charged act, but instead evidences the existence of a motive, such as a desire for revenge, which explains both the uncharged act and the charged act; in other words, "the charged crime can be understood as another expression of the feelings revealed in the [uncharged] acts." Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* vol. 1, § 4:32, 802 (3d ed., Thomson/West 2007); Imwinkelried, *Uncharged Misconduct Evidence* § 3:15, 3-98 to 3-99. We applied this theory in *Eighteenth Judicial District Court*, where the defendant was charged with causing the death of her infant daughter. We held that evidence of the defendant's past hostility toward and abusive treatment of the infant was admissible to show that the defendant was frustrated and angry and did not want her daughter and, therefore, that the defendant had a motive to cause the infant's death. *Eighteenth Jud. Dist. Ct.*, ¶¶ 58-59.

¶59     The Court and the State purport to rely on this latter approach. The prosecutor's brief in the District Court explains that the State sought to introduce evidence of Crider's prior misconduct to show "that Crider made a habit of abusing, harassing, and stalking his partner" in order "to get whatever he wants or to punish his partner for perceived infidelities." The State further explains in its brief on appeal that all of Crider's abusive acts toward M.W.— the prior uncharged acts and the presently charged acts—were the product of a single motive: "to control M.W. by force when he was unhappy with her or wanted something from her." The State reasons that the prior acts are proof of this motive, from which the jury could infer that Crider raped and assaulted M.W. on the night in question. The Court adopts this theory, reasoning that Crider's prior acts of violence and harassment establish a "motive of exerting power and control" over M.W. through the use of force and intimidation, and that this motive

29

inspired Crider to commit both the prior uncharged acts and the presently charged acts. Opinion, ¶¶ 25-26.

¶60 In my view, the Court has erred for two reasons. First, "merely reciting an allowable purpose is not sufficient if . . . that purpose is not an issue in dispute." *State v. Keys*, 258 Mont. 311, 317, 852 P.2d 621, 625 (1993). In *Keys*, the defendant (Keys) was charged with the offense of sexual intercourse without consent. There was no dispute that Keys had knowingly engaged in sexual intercourse with the victim, N.B. The issue was whether N.B. had consented. *Keys*, 258 Mont. at 314, 852 P.2d 623. The State introduced evidence of prior sexual misconduct by Keys to show that his sexual intercourse with N.B. had been without her consent. *Keys*, 258 Mont. at 315-16, 852 P.2d at 624. The State relied on theories of "motive and intent," arguing that the prior misconduct was "probative of determining whether Keys was concerned with the consent of victims of his sexually aggressive behavior." *Keys*, 258 Mont. at 316, 317, 852 P.2d at 624, 625. We explained, however, that

> it is not Keys' intent or motive which is the determinative factor in this case. Rather, it is the *victim's* intent, and whether she consented to the act of intercourse, which is dispositive of whether a crime was committed. Keys clearly intended to have sexual intercourse with N.B., and even if he intended to do this forcibly and without her consent, this criminal intent would be irrelevant if N.B. consented.

*Keys*, 258 Mont. at 317, 852 P.2d at 625 (emphasis in original). We thus held that the defendant's motive or intent is not relevant where the only issue is whether the victim consented to the sexual intercourse. *Keys*, 258 Mont. at 317-18, 852 P.2d at 625.

30

¶61 That is the situation here. There was no dispute that Crider and M.W. had sexual intercourse and that the sex was "rough." M.W. admitted that she and Crider had engaged in consensual rough sex on prior occasions. M.W. also stated that, on the night in question, she told Crider "he could do whatever he wanted" to her. M.W. indicated, however, that their sex that night was more violent than in the past and that she told Crider to stop, but he refused to do so. Crider, on the other hand, maintained that M.W. consented to the sex. The disputed issue, therefore, was M.W.'s consent, not Crider's intent. Even if Crider had a motive to punish or exert control over M.W. by having sex with her "forcibly and without her consent, this criminal intent would be irrelevant if [M.W.] consented." *Keys*, 258 Mont. at 317, 852 P.2d at 625. Thus, Crider's motive was irrelevant and the Court errs in affirming the admission of the disputed evidence under that purpose.[2]

¶62 Second, aside from the evidence's lack of relevance, the "motive" theory the Court approves here is, in truth, a forbidden character-based propensity theory. "When prior bad

---

[2] The Court's attempts to distinguish *Keys* are unpersuasive. First, the Court observes that *Keys* predates our decision in *Eighteenth Judicial District Court*. Opinion, ¶ 28. Yet, we did not expressly, or even implicitly, overrule the foregoing holding of *Keys* in *Eighteenth Judicial District Court*. Thus, the Court's reason for noting the timing of these two decisions is unclear. Second, the Court points out that Keys' prior acts were with a different victim, whereas Crider's prior acts were with the same victim. Opinion, ¶ 28. That fact, however, was not the basis of our decision in *Keys*. Whether his prior acts were with the same victim or a different victim, we explained that Keys' intent or motive was simply irrelevant: "Keys clearly intended to have sexual intercourse with N.B., and even if he intended to do this forcibly and without her consent, this criminal intent would be irrelevant if N.B. consented." *Keys*, 258 Mont. at 317, 852 P.2d at 625. The Court, notably, does not refute the principle that motive is irrelevant where the issue, as here, is one of consent. Finally, although the Court's analysis and holding under Issue 1 are premised on "the sexual acts," the Court posits near the end of its discussion that Crider's "motive to control or harass M.W." was also relevant "to his motive to commit the offenses of PFMA and witness tampering." Opinion, ¶ 28. Significantly, the Court fails to support this statement with any sort of analysis. The Court does not explain how Crider's motive was logically relevant to prove the elements of PFMA and witness tampering and how this could be accomplished without a forbidden propensity inference.

31

act evidence is offered to prove a motive for the crime, 'courts must be on guard to prevent the motive label from being used to smuggle forbidden evidence of propensity to the jury.'" *U.S. v. Varoudakis*, 233 F.3d 113, 120 (1st Cir. 2000) (citing Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice & Procedure* vol. 22, § 5240 (1978)). Indeed, "[i]t can be easy to confuse evidence of propensity with evidence of motive," *Harrison v. U.S.*, 30 A.3d 169, 178 (D.C. 2011), and "[t]he more difficult it is to distinguish motive and character, the greater the danger of jury misuse," Leonard, *Evidence of Other Misconduct and Similar Events* § 8.3, 504. Motive is a situationally specific emotion, whereas character connotes an enduring general propensity. Imwinkelried, *Uncharged Misconduct Evidence* § 3:15, 3-96. "Character is thought to be a generalized tendency to act in a particular way, caused by something internal to the actor that arises from that person's moral being." Leonard, *Evidence of Other Misconduct and Similar Events* § 8.3, 493-94. In contrast, "motive is more specific than character, and its existence in a given situation does not depend on the person's morality." Leonard, *Evidence of Other Misconduct and Similar Events* § 8.3, 496. Under the right circumstances, even nonviolent people can have a motive to act violently, and honest people can have a motive to lie. "We assume that a motive might exist because *any person* might possess one under those specific circumstances. The tendency to have such a motive is simply *human*; it does not derive from a trait of character specific to the person involved in the trial." Leonard, *Evidence of Other Misconduct and Similar Events* § 8.3, 496 (emphases in original).

¶63 The Court and the State have lost sight of this distinction. Saying that Crider has a "habit of abusing, harassing, and stalking" the women in his life, or that he has a "motive of

32

exerting power and control" over M.W. through force, is just another way of saying that Crider has a "generalized tendency" or "enduring general propensity" to behave abusively toward women, and that he acts in conformity with this disposition. Having a "motive" to exert power and control through violence is indistinguishable from having a violent and controlling character. Neither the Court nor the State identifies a situationally specific basis for Crider's "motive"; rather, the Court and the State simply view Crider as someone who has a propensity—which the Court and the State re-label as "motive"—to act abusively toward his partner as a means of controlling her, as evidenced by his past conduct. Applying the Court's analysis to other contexts, a defendant's prior drug sales could be introduced to establish a "motive" to earn money by selling drugs; a defendant's prior break-ins could be introduced to establish a "motive" to acquire jewelry by burglarizing houses; and a defendant's prior arsons could be introduced to establish a "motive" to ease financial burdens by burning property and collecting the insurance proceeds. Realistically, what such evidence actually shows is that the defendant is a drug dealer, a burglar, or an arsonist, respectively. The history of prior misconduct establishes that each of these defendants has a predisposition, or is the type of person, to employ wrongful or criminal acts to achieve his aims. Permitting "motive" to be used in this way undermines Rule 404(b)'s prohibition on showing that a person acted in conformity with his character.[3]

---

[3] "A few states have adopted a specific rule to allow evidence of past acts of domestic violence, by the same defendant against the same victim, to be admitted in prosecutions involving domestic violence without worrying about the purpose for the evidence. In other words, a true exception to the propensity rule applies, and a defendant is not entitled to a limiting instruction."

¶64     Indeed, the defendant in *Varoudakis* was charged with arson of his restaurant, and the prosecution introduced evidence that the defendant had also committed arson of his car. The theory was that the defendant had a "motive" to commit arsons in order to alleviate financial burdens by collecting insurance proceeds, and thus "[his] commission of the car fire arson in response to financial stress makes it more likely that he committed the restaurant arson in response to financial stress." *Varoudakis*, 233 F.3d at 120. The court rejected this as an improper propensity inference. *Varoudakis*, 233 F.3d at 120.

¶65     Likewise, in *State v. Brown*, 242 Mont. 506, 791 P.2d 1384 (1990), the defendant was charged with felony assault after striking and attempting to choke an officer who was in the process of placing the defendant under arrest. The State introduced evidence of prior instances in which the defendant had been verbally and physically abusive when police officers attempted to restrain or arrest him. The State claimed this evidence was admissible "for the purpose of proving defendant's motive and intent with respect to his conduct at issue in the proceedings." *Brown*, 242 Mont. at 509, 791 P.2d at 1386. Evidently, the State's theory was that the defendant had a "motive and intent" to resist any attempts to restrain him by behaving abusively toward the officer—the mirror image of Crider's so-called "motive" to exert power and control over M.W. by abusing and harassing her. We held that admitting the evidence under this theory was error because the defendant's acts in the charged and

Kenneth S. Broun, *McCormick on Evidence* vol. 1, § 190, 1042 (7th ed., Thomson Reuters 2013) (footnote omitted). Montana does not have such a rule, although today's decision effectively creates one through the expedient of re-labeling Crider's propensity for domestic violence and intimidation as a "motive."

34

uncharged instances were "spontaneous acts dictated by his character and the situation at hand." *Brown*, 242 Mont. at 510, 791 P.2d at 1386.

¶66    In the present case, the testimony about Crider's prior misconduct does not establish that he had a motive to have nonconsensual sexual intercourse with M.W.  It does establish, however, that Crider had a propensity to behave in a physically violent manner when he and M.W. had disputes regarding their relationship.  It is improper propensity reasoning to say that Crider's acts were the result of a "motive" to control M.W. through violence.  I thus conclude that the "motive" theory argued by the State and adopted by the Court is not only irrelevant under *Keys*, 258 Mont. at 317-18, 852 P.2d at 625, but also violative of Rule 404(b)'s bar on character-based propensity inferences.

¶67    I also disagree with the Court's reliance on an absence of mistake or accident theory. Opinion, ¶ 27.  "'Absence of mistake or accident' is generally synonymous with intent. Courts tend to use the phrase 'absence of mistake or accident' in cases in which the party charged with wrongdoing asserts that the harm was caused inadvertently—without the requisite intent."  Leonard, *Evidence of Other Misconduct and Similar Events* § 7.2.2, 429. In other words, the defendant concedes that the charged act occurred but denies a criminal intent by claiming innocent mistake.  Uncharged misconduct may be admissible in this situation to negate mistake.  *U.S. v. Kuipers*, 49 F.3d 1254, 1258 (7th Cir. 1995).  For example, if the defendant admits that the bookkeeping entry in question is erroneous but testifies that the entry was an unknowing mistake, proof of other incorrect entries in the same set of books would be logically relevant to rebut the claim of mistake.  Imwinkelried, *Uncharged Misconduct Evidence* § 5:33, 99.  This theory avoids the forbidden propensity

35

inference by focusing on the probability of events, not the tendency to act in accord with a disposition. Mueller & Kirkpatrick, *Federal Evidence* § 4:34, 829-30; Kenneth S. Broun, *McCormick on Evidence* vol. 1, § 190, 1039-40 (7th ed., Thomson Reuters 2013).

¶68 Again, "merely reciting an allowable purpose [under Rule 404(b)] is not sufficient if the evidence does not further that purpose or that purpose is not an issue in dispute." *Keys*, 258 Mont. at 317, 852 P.2d at 625; *accord State v. Ayers*, 2003 MT 114, ¶ 87, 315 Mont. 395, 68 P.3d 768; *see also State v. Sweeney*, 2000 MT 74, ¶ 24, 299 Mont. 111, 999 P.2d 296 (evidence of other crimes is admissible to prove intent only if intent is "a material issue"). Hence, whether an absence of mistake or accident theory is valid depends on the specific facts of the case—particularly, whether the defendant has asserted or implied that the wrongful act was the product of a mistake or accident. For instance, we approved the theory's use in *Eighteenth Judicial District Court*, where the defendant had suggested to authorities that her infant daughter's death was accidental. We held that the State could introduce evidence of the defendant's prior mistreatment of the infant to rebut her claim of accident. *Eighteenth Jud. Dist. Ct.*, ¶¶ 58, 61, 64, 65.

¶69 In the present case, Crider never claimed that he accidentally raped and assaulted M.W. He instead claimed that their sexual encounter, although violent, was consensual. The Court's theory that Crider's behavior on other occasions was necessary to disprove that he accidentally exceeded M.W.'s consent on the charged occasion, Opinion, ¶ 27, is logically flawed. First, to commit the offense of sexual intercourse without consent, the person must "knowingly ha[ve] sexual intercourse without consent with another person." Section 45-5-503(1), MCA. If Crider knew that M.W. had withdrawn her consent to the sex, then he

36

could not claim that he "accidentally" raped her. Conversely, if Crider did not know that M.W. had withdrawn her consent, then he did not "knowingly ha[ve] sexual intercourse without consent." Second, the prior instances of misconduct cited by the Court—making constant phone calls to M.W., lurking outside her place of residence, breaking down her door, and preventing her from calling the police, Opinion, ¶ 26—are not probative of the issues in dispute, namely, (1) whether M.W. withdrew her consent to the sex on the evening of July 8, 2011, and (2) whether Crider knew that M.W. had withdrawn her consent to the sex that evening. None of the prior instances of misconduct involved sexual relations between Crider and M.W., and the evidence sheds no light on what M.W. intended, and what Crider knew, on the night in question. The evidence was simply not relevant to the issues at trial.

¶70 On the other hand, the evidence was highly prejudicial. We have recognized the dangers of uncharged misconduct evidence in numerous cases. *State v. Derbyshire*, 2009 MT 27, ¶¶ 21-22, 51, 349 Mont. 114, 201 P.3d 811; *State v. Sage*, 2010 MT 156, ¶¶ 36-37, 357 Mont. 99, 235 P.3d 1284; *State v. Rogers*, 2013 MT 221, ¶¶ 31-32, 371 Mont. 239, 306 P.3d 348. Generally, such evidence must be excluded because "prior acts or crimes are highly prejudicial to the defendant, and usually irrelevant for purposes of the charged crime." *State v. Croteau*, 248 Mont. 403, 407, 812 P.2d 1251, 1253 (1991); *accord State v. Ray*, 267 Mont. 128, 133-34, 882 P.2d 1013, 1016 (1994). Evidence of a defendant's prior acts or uncharged misconduct creates the risk that the jury will penalize the defendant simply for his past bad character, *Croteau*, 248 Mont. at 407-08, 812 P.2d at 1253; *Ray*, 267 Mont. at 134,

37

882 P.2d at 1016, or prejudge him and deny him a fair opportunity to defend against the particular crime charged, *State v. Gowan*, 2000 MT 277, ¶ 19, 302 Mont. 127, 13 P.3d 376.

¶71 As discussed, the evidence of Crider's prior instances of abuse and harassment had little, if any, probative value to the issues at his trial. In contrast, the evidence created a substantial risk of swaying the jury to penalize Crider for his violent character or history of bad behavior. The prosecution used the evidence to portray Crider as a stalker and domestic abuser—a man who, as the prosecutor put it, "made a habit of abusing, harassing, and stalking his partner" in order "to get whatever he wants or to punish his partner for perceived infidelities." In *Sage*, we agreed with the defendant that evidence of drug use at his house "likely painted him as either a person who gave 'pot parties' at his house, or was possibly a drug dealer." *Sage*, ¶ 30. We concluded that, qualitatively, the erroneous admission of this evidence was not harmless. *Sage*, ¶ 30. In my view, "the qualitative impact" of Crider's history of violence and intimidation, *Derbyshire*, ¶ 54, was even more prejudicial than the evidence of drug use in *Sage*. There is a "reasonable possibility" that this evidence contributed to Crider's conviction, and thus the admission of the evidence was not harmless. *Sage*, ¶ 30; *see also Rogers*, ¶ 44 (reaching the same conclusion where the State presented "highly inflammatory" evidence that Rogers had previously been convicted of rape and assault, but had gotten those convictions set aside; such evidence, we explained, "invited an opportunity for the jury to make sure Rogers would be punished when it deliberated on [the] crimes charged").

## Conclusion

¶72    In sum, I conclude that Crider did not properly preserve his Rule 404(b) claim for appellate review. However, because the Court has nevertheless reached the merits of that claim, I conclude that the evidence of Crider's uncharged misconduct should not have been admitted under motive or absence of mistake or accident theories, and that the erroneous admission of this evidence was not harmless. Accordingly, under our precedents, Crider is entitled to a new trial. *Derbyshire*, ¶ 55; *Sage*, ¶ 43; *Rogers*, ¶ 46.

¶73    I dissent from the Court's contrary holdings.

/S/ LAURIE McKINNON